*In re* MARRIAGE OF WILLIAM MURPHY, Petitioner and Counter-respondent-Appellee and Cross-Appellant, and CATHERINE A. MURPHY, Respondent and Counterpetitioner-Appellant and Cross-Appellee.

Third District  Nos. 3—04—0142, 3—04—0310 cons.

Opinion filed August 1, 2005.

Paul J. Bargiel (argued), of Chicago, for appellant.

Sarane C. Siewerth (argued), of Schiller, DuCanto & Fleck, of Chicago, and Carlton Marcyan, of Lake Forest, for appellee.

JUSTICE BARRY delivered the opinion of the court:

William (Bill) and Catherine (Cathy) Murphy were married on November 18, 1988. Dissolution proceedings between the parties commenced in 1998 and a judgment of dissolution was entered on February 19, 2003. The trial court's rulings, in part, upheld the validity of the parties' antenuptial agreement and ordered Bill to pay Cathy $15,000 per month from November 1, 2003, through May 31, 2007, in maintenance. Cathy appeals.

## FACTS

Bill and Cathy Murphy were married on November 18, 1988. For the duration of the marriage, Bill, currently age 64, was employed as co-owner of a pipeline construction business. Cathy, currently age 56, terminated her prior employment as an office manager in 1989 and accompanied Bill on his various business trips. No children were born of this marriage. In April 1998, Bill filed a petition for dissolution of marriage in Rock County, Illinois. Cathy filed a response to this petition in December 1998, and further filed a counterpetition for legal separation. Because the issues raised in this appeal involve the parties' antenuptial agreement and the trial court's determination of Cathy's maintenance award, we confine our discussion of the facts to solely these matters.

In November 2001, the trial court commenced proceedings on Cathy's motion to declare the parties' antenuptial agreement invalid and unenforceable. Cathy testified as follows: Cathy stated that Bill did not mention that he would need an antenuptial agreement until the night of Wednesday, November 16, 1988, two days before the wed-

ding. Cathy said that she was under a lot of stress that week due to last-minute wedding preparations. Cathy stated that because Bill's divorce from his prior wife was not final until November 15, 1988, Cathy and Bill were forced to keep their wedding plans a secret from many of their family and friends, and this made planning the wedding even more stressful for Cathy. On Thursday, November 17, Cathy called Mike Rock, an attorney she had used in the past, to see if he could meet with her and Bill and draw up an agreement for them. Cathy and Bill proceeded to Rock's office that afternoon and, during their meeting, Bill took out a draft of an agreement for Rock to review. Cathy stated that she had not previously seen that document. Rock explained parts of the agreement to Cathy and then advised her not to sign it because it was very one-sided. Cathy testified that she told Rock to draft a new agreement and she and Bill did not discuss the issue any further that day.

Cathy stated that on Friday, November 18, she and Bill went to Rock's office in the morning. Rock explained his draft of the agreement to Cathy. Cathy said that Bill said nothing negative about Rock's draft. Before the parties left Rock's office, Cathy asked Rock what he thought would happen if she did not sign the agreement, to which he responded, "I don't think he'll marry you." Cathy stated that she began to cry when the parties reached their car, and Bill then offered to include a clause in the agreement to make her feel better. He told her that he could guarantee her $35,000 a year for every year the parties were married, or half of whatever he and she accumulated, whichever was greater. Cathy stated that she thought this clause would be inserted into Rock's draft.

Cathy testified that later on Friday, Cathy and Bill went to see Jeff Moorhouse, Bill's attorney. Cathy stated that she had never before met or spoken with Moorhouse. Cathy and Bill left Moorhouse's office in order for the agreement to be redrafted and returned later that afternoon. Cathy said that she then made a phone call in the conference room while Bill discussed the agreement with Moorhouse. Bill entered the conference room while she was on the phone, handed her a copy of the agreement and told her to sign it. Cathy told Bill that she wanted to read the agreement first, but he then told her it was getting late. Cathy saw that the time was approximately 3:40 p.m., and the parties' wedding was scheduled for 6:30 p.m. She asked Bill if the agreement was exactly as they had discussed, and after he said that it was, she signed it.

Bill's version of the events surrounding the antenuptial agreement were as follows: Bill testified that he had mentioned the antenuptial agreement to Cathy briefly in August and October of 1988, but that

Cathy told him in October that she did not want to discuss the issue until he was divorced. Bill stated that on Monday, November 14, 1988, he told Cathy that Moorhouse was going to draft an antenuptial agreement and that she would have to give Moorhouse some information the following morning. On Tuesday, November 15, Bill called Moorhouse in the morning and put Cathy on the line. Around noontime, Bill then picked up two copies of Moorhouse's draft, signed one, and gave Cathy a copy at the airport. Bill does not know whether he gave Cathy the signed or unsigned copy. From the airport, Bill flew to Minnesota for dissolution proceedings pertaining to his prior wife. Bill stated that he called Cathy that afternoon to tell her that his divorce was final, and she told him that she had been crying over the agreement he had given her because it gave her nothing. Cathy told him that she wanted to see Rock that afternoon and made an appointment. Upon his return, Bill and Cathy went to Rock's office and Cathy gave Rock her copy of the agreement. Rock told Bill he thought the agreement was unfair to Cathy, and Bill told Rock to revise the agreement and send a copy to Moorhouse.

Bill stated that on Wednesday, November 16, he received a phone call from Moorhouse, who received Rock's draft of the antenuptial agreement. Bill stated that he told Cathy that this agreement "wasn't going to fly." Bill instructed Moorhouse to include a clause that granted Cathy $35,000 a year for up to 10 years. Bill told Cathy of this inclusion, and she said she would take it to Rock the following day. Bill testified that on Thursday, November 17, Cathy called him at work and said that she went over the agreement with Rock, and she wanted to include a provision for maintenance after 10 years of marriage. Bill called Moorhouse and instructed him to include a provision that stated there was no waiver of maintenance after 10 years of marriage. Bill said that later that night Cathy asked for an additional provision that would allow her to choose between one-half of their accumulated earnings or the $35,000 a year for up to 10 years, whichever number was greater.

Bill testified that on Friday, November 18, he and Cathy went to Moorhouse's office and he told Moorhouse about the "accumulated earnings" provision. Moorhouse discussed the provision with Bill while Cathy was on the telephone, and Bill finally told Moorhouse to include the clause in the agreement. Bill stated that Moorhouse brought the final draft of the agreement into the conference room and pointed out the changes to both parties. Cathy and Bill then signed the agreement and Judy Foxall, Moorhouse's notary, notarized it. Bill said that the parties left Moorhouse's office at approximately 4 p.m.

A great deal of litigation also revolved around the validity of a

second antenuptial agreement, the "Swayer document," which Cathy had discovered. This document was also purportedly signed by both Cathy and Bill on the same date, but it contained a different notary signature, that of an "Anne Swayer." Both parties eventually stipulated that the antenuptial agreement that was notarized by Foxall was the effectual agreement.

At the close of evidence, the trial court incorporated the following findings into its order. With regard to the Swayer document, the court stated that the document was relevant to the extent it assisted the court weigh the testimony and determine the timeline of events leading up to the agreement's execution. The court noted that the Swayer document was identical to Moorhouse's first draft of the antenuptial agreement and it contained Rock's name. The court concluded that this document was the copy of the first agreement that was shown to Rock. When Cathy had been asked how Rock's name could have appeared on Moorhouse's first draft if, according to her story, Cathy and Bill did not go to Rock's office until Thursday, she stated that Bill was smart enough to know which lawyer she would contact. The court did not find Cathy's explanation to be credible, particularly as the court could not recall any testimony that would indicate Bill knew that Rock did past legal work for Cathy.

The court found that the parties were engaged to be married at the time of the agreement's execution and were therefore operating within a confidential relationship. The court also found that both parties had free access to their attorneys. The court noted that three changes were made to Moorhouse's original draft. These changes were the inclusion of the following three maintenance provisions:

"(1) If the marriage is dissolved at anytime prior to ten (10) years from the date hereof, [Cathy] KRAUS shall receive the greater of the following:

(i) $35,000 per year for a maximum of ten (10) years or the death or remarriage of KRAUS whichever occurs first; or

(ii) One half (½) of [Bill] MURPHY's accumulated earnings from the date hereof to the date the marriage is dissolved, payable over a ten (10) year period as set forth above.

(2) KRAUS does not waive any claim for alimony, maintenance and support from MURPHY, after ten (10) full years of marriage."

By Rock's testimony, he had nothing to do with these changes. The court found that Cathy engaged in negotiations for these provisions and, accordingly, found that the agreement was not a product of coercion or duress.

The court further found, if Rock's agreement was to be considered the effectual agreement, that no reasonable person would have

believed that Moorhouse was making amendments to Rock's version of the agreement. The court noted that Rock's agreement did the exact opposite of Moorhouse's original draft, in that the terms were one-sided in favor of Cathy. The court commented that it would make no sense for Moorhouse to make the above amendments to an agreement that already gave Cathy everything. The court found that the terms of Moorhouse's final agreement were not unconscionable, as they provided for unlimited and unrestricted maintenance after 10 years of marriage. With regard to the "accumulated earnings" provision, the court noted that the provision is now moot and therefore did not address whether it was ambiguous or otherwise invalid.

The court found that the agreement was not without stress, but declined to find that duress existed due to the last-minute nature of its execution. The court stated that much of the stress was caused by Bill and Cathy's secrecy with the marriage preparations and that Cathy was as much a part of this deception as Bill was. Further, the court noted that it is inherent in every antenuptial agreement that a party might not marry the other if the agreement is not signed. Lastly, with regard to Moorhouse's ethical behavior during the negotiations, the court stated that there was little difference between both attorneys in this case. Neither attorney contacted the other when creating drafts of the agreement and both of them engaged in discussions with their clients while in the presence of the nonclient.

The trial court then commenced hearings on the issue of maintenance and property division. Cathy testified to the following. She has some health problems, specifically, a growth on her thyroid and a lump in her breast. She takes medication and monthly supplements for her health. Before meeting Bill, Cathy worked as an office manager and bookkeeper and had been in the workforce for approximately 20 years. Cathy left her last job as an office manager and bookkeeper in February 1989, where she made approximately $25,000 a year. Cathy has a high school education and has also taken some computer courses. During the dissolution proceedings, Cathy testified that her only source of income was her temporary maintenance award, which had been increased to $15,000 per month in December 2001. She stated that she had not made any efforts to look for a job since the proceedings commenced because she spent much of her time on the case. Cathy's most recent financial affidavit listed her actual living expenses at $12,959, which Cathy testified was more than she received out of her monthly temporary maintenance award after taxes.

Cathy testified that she currently owns a three-bedroom house in Davenport, Iowa, and a condominium in Moline, Illinois; and she is renting an apartment in Chicago, Illinois. Cathy's monthly mortgage

payment on her condominium is $1,083, and monthly rent for her apartment is $2,347. Cathy does not rent out her condominium and she allows her son to live in her house rent-free. Much of Cathy's testimony regarding her standard of living is reiterated in the testimony and report of James Kazmier, Cathy's accountant, which we discuss thoroughly below. With regard to the purpose of her numerous trips with Bill, Cathy testified: "Bill would go to his meetings, I'd go shopping" and "Bill did business, but basically I just went along. Traveled." Cathy stated that she did not do any business on these trips herself, except to help Bill entertain.

James Kazmier, a CPA engaged by Cathy, testified regarding the standard of living that Cathy enjoyed during the marriage. Kazmier created a report which analyzed the costs accumulated between 1997 and 1998, and determined that Cathy would require $555,995 per year, or approximately $46,000 per month, in order to maintain the same standard of living. Kazmier's analysis divided this estimated amount into 14 expense categories: household, automobile, aircraft, yacht, travel, meals and entertainment, telephone, moving, spending cash, gifts, jewelry, medical, personal, and miscellaneous. The household expenses included the annual cost to obtain a mortgage on a home similar to the residence the parties occupied in Moline, Illinois, laundry and dry cleaning expenses, maid service for the Moline residence, and the annual cost to lease and redecorate a residence similar to the one they resided in when in Scottdale, Arizona. Kazmier stated that the redecorating costs were included on an annual basis because Cathy was accustomed to living in a house decorated to her taste. Further, Kazmier attributed 100% of the laundry and dry cleaning costs accumulated by both parties over the two years he analyzed to Cathy. For automobile expenses, Kazmier stated that Cathy was accustomed to having three cars at her disposal: a 1997 Mercedes 500S, a leased 1998 Mercedes 500S, and a 1995 Chevrolet Suburban. The Chevrolet Suburban had been owned by Bill's company, but was available for Cathy's use and kept at the parties' residences. Because Cathy was awarded the 1997 Mercedes 500S, Kazmier estimated that the annual cost of leasing, repairs, and gasoline for one Mercedes and a Chevrolet Suburban would be $17,693.

Kazmier next determined that the annual cost of having an airplane available to Cathy, renting the airplane, pilot fees, and operating expenses would be $78,025. He based his calculations on her travel times averaged over the two years, and attributed the entire cost of the plane use to Cathy. Kazmier also attributed the entire cost to charter a yacht three times a year, $5,250, solely to Cathy. Kazmier determined Cathy's annual travel expenses, $19,858, by totaling the

costs of commercial airfare, lodging, use of a travel agent, and related travel costs. He noted that he attributed 100% of travel lodging to Cathy because the basic hotel room rate is not divisible. Cathy's meals and entertainment expenses, per Kazmier, total $38,303 per year. Kazmier stated he did not divide the expenses from restaurants because Cathy's lifestyle included dining out and "she may have people with her." Kazmier also included in this category the cost of memberships in clubs and social organizations, activities at various country clubs, golf events, and half of a skybox lease.

Kazmier attributed 50% of all the phone calls from the home to Cathy, totaling $4,397 in annual telephone expenses. Kazmier determined her annual spending cash, $20,511, by allocating 50% of the average annual amount cashed from the parties' checks to Cathy. Cathy's gift expenses, $11,674, were calculated from the average of gifts made to a variety of people and charitable organizations either by the parties or through Murphy Brothers, Inc. Kazmier also determined that Cathy's annual jewelry expense is $14,566. He testified that Cathy is entitled to receive an amount of money to purchase jewelry in the future similar to that she was accustomed to receiving during the marriage. The remainder of Cathy's expenses included medical ($17,494 for insurance and medication), personal ($46,382 for grooming, clothing, home owner's insurance), and miscellaneous ($4,567 for newspapers, magazines, sports equipment, bank fees). Lastly, based upon his calculations of Bill's assets, minus all liabilities, Kazmier estimated that Bill's net worth is approximately $45 million. Kazmier stated that he took this into account when determining Cathy's maintenance award.

Bill testified to the following. He has had some health issues, such as a heart problem and gall bladder surgery, and takes medication on a daily basis. Bill is a high school graduate and began a pipeline construction company in 1971. He owns 50% of the company, Murphy Brothers, Inc., and Bill is the current president and treasurer. Bill's work duties include reviewing completed work, meeting with clients and customers and cultivating new contacts in the industry. Bill's position requires much travel, both domestic and international, and sponsorship and participation in events in order to cultivate and entertain clients. Bill testified that his salary has been $5,000 per week for approximately the past four to five years, which amounts to an annual salary of approximately $260,000. Bill also has ownership interests in various other entities, including Murphy Brothers Partnership, Midwest Technologies, and Murphy Pipeline. Bill stated that Murphy Brothers, Inc., is currently in its worst cash position, in part due to losing $3 million on a recent project. Bill stated that he received

a tax refund in the amount of $3 million in 2002, but he had to loan part of that refund back to Murphy Brothers, Inc., per a secured credit agreement with his bank.

Bill testified that the majority of the trips he and Cathy took were for a business purpose, and Cathy's access to the plane was mostly limited to her accompanying Bill on his business trips. Bill stated that Murphy Brothers, Inc., paid for much of the parties' lifestyle, including home and cellular phones, country club memberships, limousine use, airplane use, dining and other charges at various country clubs, caterers for home parties, several sport utility vehicles (SUVs), and the yacht. Bill noted that Murphy Brothers, Inc., was given access to a skybox courtesy of Bartlett Agency, a company that Murphy Brothers, Inc., had helped generate business, and that Murphy Brothers, Inc., did not pay for the skybox itself. Bill said that he and Cathy had many arguments from 1996 through 1998 regarding her spending habits, and that the amount of cash not deposited had increased from $8,000 in 1997 to $30,000 in 1998. Bill also testified that in 1998 he made a very large jewelry purchase for Cathy for their tenth anniversary.

Jerome Lipman, Bill's financial expert, testified regarding his analysis of Bill's net cash flow. Lipman stated that he reviewed both recurring and nonrecurring cash flow items in order to more accurately determine the net amount of cash available to Bill. "Nonrecurring" items included cash that was received by Bill in order to pay certain taxes or bills, or advances to and from various partnerships that did not occur on a regular basis. Lipman explained that one such nonrecurring item was the $3 million tax refund that Bill received. Lipman calculated Bill's net cash flow, based upon recurring items, as follows: $182,732 in 2002; $278,146 in 2001; $265,723 in 2000; $367,906 in 1999; and $592,421 in 1998.

At the conclusion of evidence, the trial court issued the following findings. The court granted Cathy 100% of the parties' joint marital property accounts, totaling approximately $590,478, and the 1997 Mercedes automobile. In nonmarital property, the court noted that Cathy received approximately $235,585, which included her various annuities, savings, checking and money market accounts; her house in Davenport, Iowa, and equity in her condominium in Moline, Illinois. The court made specific comments on several of the maintenance factors under section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(a) (West 2002)). First, the court found that the duration of the marriage was 10 years, as the several years spent in litigation of the dissolution did not extend the marriage. Next, the court noted that the standard of living had been a major factor in his consideration of the maintenance award. The court stated:

"The stated need for $45,000.00 per month before taxes to maintain a lifestyle depends, for justification, on the study of Investigative Valuation identified as [Cathy's] Exhibit RX 149. The Court finds the valuation and the means by which these valuations were arrived at to be, in the main, inflated if not bloated. The credibility of the report is key. Many of the "costs of living" cited were provided by the business for business purposes. (i.e. travel, hotels, a jet, the availability of the yacht.) It does not follow that while William Murphy is one-half owner in a non-marital business, that he can write checks to finance a duplicate set of identical expenses outside of the business. This would be tantamount to financing two businesses, one real and one imagined, with income from only the real."

The court lastly commented that it was taking into consideration the fact that Bill "has and will continue to pay hundreds of thousands of dollars in attorney and expert witness fees" for both Cathy and himself. The court ordered Bill to continue maintenance payments to Cathy in the amount of $15,000 per month, terminable on May 31, 2007, without review. The court also assigned Bill the costs for Cathy's attorney and expert fees in the amount of $451,524.41. Cathy timely appeals.

## ANALYSIS

On appeal, Cathy challenges the validity of the parties' antenuptial agreement and the amount and duration of the trial court's maintenance award. We first address whether the parties' antenuptial agreement is valid and enforceable. An antenuptial agreement entered into before the 1990 enactment of the Illinois Uniform Premarital Agreement Act (750 ILCS 10/1 *et seq.* (West 1999)) will be found valid and enforceable if it meets the following requirements: (1) an unforseen condition of penury is not created due to lack of property resources or lack of employability; (2) the agreement is entered into with full knowledge and without fraud, duress, or coercion; and (3) the agreement is fair and reasonable. *Warren v. Warren*, 169 Ill. App. 3d 226, 230, 523 N.E.2d 680, 682-83 (1988).

We initially note that the record reveals that the trial court likely employed an incorrect standard, without correction, in determining the validity of the parties' antenuptial agreement. Instead of finding the agreement fair and reasonable, the trial court found that the terms were "not unconscionable," which is the standard for determining the validity of antenuptial agreements under the 1990 enactment of the Illinois Uniform Premarital Agreement Act. 750 ILCS 10/7(a)(2) (West 1999). However, even if the trial court employed an incorrect means of testing the parties' agreement, this itself does not mean that

the cause must be remanded. This court can affirm a trial court's decision for any reason supported by the record, regardless of the trial court's reasoning. See *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 241, 813 N.E.2d 313, 317 (2004). If the decision of the trial court is correct, it will not be reversed on appeal simply because an incorrect means was used to arrive at that decision. *In re Marriage of Benefield*, 131 Ill. App. 3d 648, 650, 476 N.E.2d 7, 9 (1985). This is especially true where reversal and remand would only result in the same decision. *Benefield*, 131 Ill. App. 3d at 650, 476 N.E.2d at 9.

■ Because this court finds that the terms of the agreement are fair and reasonable, reversal in this case would be inappropriate. In order for an antenuptial agreement to be fair and reasonable, Illinois requires that the agreement guarantee both parties an equitable financial settlement in lieu of a waiver of their rights to property or maintenance. *Warren*, 169 Ill. App. 3d at 231, 523 N.E.2d at 683. Cathy attempts to compare the circumstances in the instant case with those in *Warren v. Warren*, 169 Ill. App. 3d 226, 231, 523 N.E.2d 680, 683 (1988), where the appellate court found that the terms of the parties' antenuptial agreement were unfair and unreasonable because they provided no financial settlement for the wife upon divorce. The court noted that during the marriage the couple lived a very extravagant lifestyle, much more extravagant than the wife could ever afford on her own. *Warren*, 169 Ill. App. 3d at 231, 523 N.E.2d at 683. Under those circumstances, the court concluded that a total waiver of maintenance on her part was not fair and reasonable. *Warren*, 169 Ill. App. 3d at 231, 523 N.E.2d at 684.

The critical distinction between *Warren* and the instant case is obvious: Cathy never waived any right to maintenance for a marriage lasting 10 years or more. As aptly noted by the trial court, how could the terms of an agreement that provide for unlimited maintenance be found unfair and unreasonable? We do not think they can, particularly as the three maintenance provisions included in the antenuptial agreement were negotiated by Cathy.

Cathy next contends that the parties' antenuptial agreement is invalid because it is not sufficiently clear, definite and certain to be an enforceable contract. Cathy argues that the provision of the antenuptial agreement that provides for one-half of Bill's accumulated earnings is indefinite and there was no meeting of the minds by the parties as to what the term was supposed to mean.

■ The rules governing the interpretation of contracts also apply to the interpretation of antenuptial agreements. *In re Marriage of Drag*, 326 Ill. App. 3d 1051, 1055, 762 N.E.2d 1111, 1115 (2002). In order for a valid contract to be formed, an offer must be so definite as

to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981, 983 (1991). An enforceable contract must also include a meeting of the minds or mutual assent to the terms of the contract. *Liccardi v. Stolt Terminals (Chicago), Inc.*, 283 Ill. App. 3d 141, 146, 669 N.E.2d 1192, 1197 (1996).

■ The antenuptial agreement in the instant case provided Cathy with three separate maintenance provisions. Two of these provisions were applicable only if the marriage lasted less than 10 years, and the third provision only applied if the marriage lasted 10 years or more. For a marriage less than 10 years, Cathy could have chosen to receive either (1) $35,000 a year for each year the parties were married, up to 10 years; or (2) one-half of Bill's accumulated earnings during their marriage. After 10 years of marriage, the agreement provided that Cathy did not waive any claim to maintenance. The trial court stated that the issue of whether the term "accumulated earnings" was vague or indefinite was moot, given that Cathy and Bill were married longer than 10 years and the "accumulated earnings" provision was no longer applicable. We agree. An issue becomes moot where the interests and rights of the parties are no longer in controversy and resolution of the issue will have no practical effect. *Walker v. Lewis*, 352 Ill. App. 3d 952, 962, 817 N.E.2d 928, 935 (2004). Because the "accumulated earnings" provision did not apply to a marriage over 10 years, determining whether this term is vague or indefinite would have no effect on Cathy's rights under the antenuptial agreement.

■ Cathy next alleges that there was no meeting of the minds when the antenuptial agreement was executed because she believed she was signing Rock's draft of the agreement with Moorhouse's amendments, rather than Moorhouse's draft with the amended provisions. Cathy argues that there were significant differences between these drafts, such as the use of Illinois versus Iowa law, and that Moorhouse never explained these differences to Cathy. This argument wholly depends on this court finding Cathy's depiction of the events leading up to the signing of the antenuptial agreement more credible than Bill's testimony.

In the lower proceedings, the trial court noted that it did not find Cathy's timeline of events believable. The court based this finding on the Swayer version of the antenuptial agreement, which the court believed was Moorhouse's first draft that was brought to Rock for review. The court did not find Cathy's testimony regarding how Rock's name appeared on that draft to be credible and determined that Bill's version of the events—particularly Cathy speaking to Moorhouse on

the phone earlier in the week to give him her personal information—was more likely. The court further did not believe Cathy's contention that she thought she was signing Rock's draft of the agreement. The court pointed out that Rock's agreement was completely one-sided in favor of Cathy and noted that Bill had testified that he said it was not "going to fly." Further, the court commented that it would have been unnecessary to add Cathy's maintenance changes to Rock's agreement, which was already favorable to Cathy.

It is the function of the trial court to resolve conflicting testimony by assessing the credibility of the witnesses and determine the weight to be accorded their testimony. *In re Marriage of Smith*, 347 Ill. App. 3d 395, 400, 806 N.E.2d 727, 731 (2004). Based on a review of the record, we cannot say that the trial court erred in making its findings. We agree that no reasonable person would have believed that Moorhouse would have made amendments to Rock's version of the antenuptial agreement. Given that Rock's version of the agreement simply did the reverse of Moorhouse's original version, *i.e.*, was one-sided in Cathy's favor, it is unlikely that Bill would have said "nothing negative" about Rock's draft, as Cathy testified. Further, because Cathy continued to negotiate with Bill for additional maintenance provisions, it is only logical that these provisions were contemplated to be added to Moorhouse's version of the agreement. Indeed, as Rock's version was already one-sided in Cathy's favor, Cathy would have no need to negotiate for additional provisions to be added to that draft.

■ Cathy's final argument regarding the parties' antenuptial agreement is that the agreement is invalid because it is a product of fraud, coercion or duress. Cathy alleges that the timing of the agreement was such that she had little opportunity to review the document and that Moorhouse unethically confronted her with the final version of the antenuptial agreement without trying to contact Rock.

Where the parties entered into an antenuptial agreement absent fraud, duress or coercion, the agreement is valid and enforceable. *In re Estate of Hopkins*, 166 Ill. App. 3d 652, 656, 520 N.E.2d 415, 417 (1988). The period of time between the execution of the antenuptial agreement and the marriage ceremony is only one factor among many that is considered when determining the validity of the agreement. See *Hopkins*, 166 Ill. App. 3d at 658, 520 N.E.2d at 419. Further, merely conditioning marriage upon the execution of an antenuptial agreement does not give rise to duress. See *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 519, 755 N.E.2d 522, 527 (2001).

In the instant case, although the time period surrounding the execution of the parties' antenuptial agreement was strained, it did not rise to the level of duress or coercion. Even if Bill did not mention

the antenuptial agreement for the first time until the week of the wedding, Cathy still had time to have Rock review Moorhouse's draft of the agreement, have Rock create his own draft and explain it to her, and negotiate three provisions for maintenance to be included in the final agreement. Because these maintenance provisions were negotiated by Cathy, not Rock, we find that Cathy was well aware of what the antenuptial agreement provided for her. We agree with the trial court that the circumstances surrounding the execution of the agreement were certainly stressful, but it was unlikely a product of coercion or duress. Per Rock's and Cathy's testimony, Cathy was made aware that if she wanted to marry Bill, she would have to sign an antenuptial agreement. She knowingly made that choice and further negotiated for her benefit.

We also disagree with Cathy's contention that Moorhouse's conduct surrounding the execution of the agreement gives rise to coercion or duress. The final agreement that Cathy signed was identical to Moorhouse's original draft, which had already been explained to her by Rock, except for the inclusion of her three maintenance provisions. Because we find that Cathy knew she was signing an amended version of Moorhouse's original draft and further knew what that agreement provided her, Cathy cannot now contend that the agreement is unenforceable simply because she failed to consult Rock one last time.

■ Cathy finally contends that the trial court abused its discretion in awarding her maintenance in the amount of $15,000 per month, terminable May 31, 2007, without review. Cathy argues that the amount and duration of this award are against the manifest weight of the evidence, particularly given Bill's finances and the standard of living enjoyed during the marriage.

Maintenance is designed to be rehabilitative in nature and to allow the dependent spouse to become financially independent. *In re Marriage of Haas*, 215 Ill. App. 3d 959, 964, 574 N.E.2d 1376, 1379 (1991). Permanent maintenance, on the other hand, is appropriate where it is evident that the recipient spouse is either unemployable or employable only at an income that is substantially lower than the previous standard of living. *Haas*, 215 Ill. App. 3d at 964, 574 N.E.2d at 1379. Section 504(a) of the Act (750 ILCS 5/504(a) (West 2002)) provides that a court is to award maintenance in an amount and duration as it deems just, after consideration of the following factors: the income and property of each party; the needs of each party; any impairment of present and future earning capacity of the recipient spouse due to devoting time to or foregone opportunities because of the marriage; the standard of living established during the marriage;

the duration of the marriage; the age and physical and emotional condition of both parties; and any contribution and services by the recipient spouse to the other spouse. *In re Marriage of Stam*, 260 Ill. App. 3d 754, 756, 632 N.E.2d 1078, 1080 (1994).

In awarding maintenance, courts have wide latitude in considering what factors should be used in determining reasonable needs, and the trial court is not limited to the factors listed in the governing statute. *In re Marriage of Mohr*, 260 Ill. App. 3d 98, 107, 631 N.E.2d 785, 791 (1994). No one factor is determinative of the issue concerning the propriety of the maintenance award once it has been determined that an award is appropriate. *Mohr*, 260 Ill. App. 3d at 107, 631 N.E.2d at 791. When determining the amount and duration of maintenance, the trial court must balance the ability of the spouse to support him or herself in some approximation to the standard of living he or she enjoyed during the marriage. *In re Marriage of Shinn*, 313 Ill. App. 3d 317, 322, 729 N.E.2d 546, 550 (2000).

The issue in this case is primarily what expenses should be included in the parties' standard of living when determining the amount and duration of the maintenance award. Cathy contends that the trial court erred by finding a difference between the benefits the parties enjoyed through Bill's employment and those unrelated to his job. Cathy argues that regardless of the source of these luxuries, they became a part of her accustomed standard of living and she is entitled to continue to receive these benefits.

Whether employment-related benefits should be included in the standard of living for purposes of determining a recipient spouse's maintenance award is a question of first impression for this court. However, given the circumstances in this case, we find that the trial court was correct in refusing to order Bill to "finance a duplicate set of identical expenses outside of the business." Cathy enjoyed many benefits—travel, dining, golf tournaments, catered events, a skybox— for the sole reason that she was Bill's companion. Cathy ignores the fact that the purpose of these benefits was not travel and shopping, but rather they were a part of Bill's job. Aside from occasionally acting as a hostess, Cathy did nothing on these ventures to assist Murphy Brothers, Inc., the source of the dollars expended. As Cathy even testified, Bill did business on these trips and she would go shopping. Further, these business-related benefits are not entirely "benefits" to Bill. He is responsible for entertaining clients, maintaining and developing industry contacts, and checking on the progress of work at various sites. Simply because Cathy was along while he conducted his business does not mean that Cathy should forever enjoy the benefits of Bill's employment. Cathy's argument completely ignores the busi-

ness function of these trips, and it would be absurd for this court to order Bill to fund duplicate "business" trips just so Cathy can continue to travel and shop.

We further agree with the trial court that the report Cathy relied upon to justify her standard of living costs is not credible. First, much of Kazmier's report concerns business-related expenses that we find Cathy is not entitled to receive, such as golf tournaments, skybox lease, aircraft expenses, the majority of the travel expenses. Cathy has no business-related reason to treat her family and friends to an aircraft, expensive meals, or a yacht. Next, Kazmier did not take into account that Cathy, as a single woman, would not require as much living space as she and Bill had. In determining her housing expenses, Kazmier instead estimated the cost of obtaining a mortgage on a roughly identical house in Moline, Illinois, without determining what the cost of housing would be for a smaller house of proportional value. It also appears from Kazmier's testimony that his calculations regarding various expenses were based upon imprecise assumptions. For example, Kazmier admitted that he attributed 100% of certain of the parties' costs to Cathy, such as laundry and dry cleaning, despite the fact that those costs had been for both parties over the two-year period. Kazmier also assumed that 50% of the telephone expenses should go to Cathy, even though Bill testified that he frequently used the home phones for business.

An additional problem with Kazmier's report is that certain of Cathy's expenses do not seem to be accurately estimated by only looking at two years' worth of receipts. For example, the spending cash expense estimate was only based upon 1997 and 1998; however, Bill testified that the amounts of spending cash taken out in those two years were grossly disparate. Indeed, while only $8,000 was cashed from checks in 1997, $30,000 was taken out in 1998. Lastly, Kazmier's jewelry expense category is simply unbelievable, particularly given that this estimate included a large gift to Cathy for the parties' tenth anniversary. Cathy cannot reasonably expect this court to order Bill to pay her a monthly sum to finance further gifts of jewelry, postdissolution.

To briefly address the remaining pertinent statutory factors for maintenance, we note that Cathy's most recent financial affidavit stated that her monthly living expenses were $12,959. We first consider that Cathy received a considerable amount of nonmarital and marital property, including 100% of the parties' joint marital accounts. In total, Cathy was awarded approximately $826,000, plus a 1997 Mercedes. We note that the sum of $826,000 is certainly an income-producing asset, as even a basic investment of this large a sum of

money would earn considerable interest. It is also important to stress that Cathy received at least one other, and perhaps two, income-producing assets. See *In re Marriage of Keip*, 332 Ill. App. 3d 876, 882, 773 N.E.2d 1227, 1232 (2002). While the recipient spouse is not required to liquidate assets in order to generate sufficient income to live on, he or she does have a good-faith obligation to become self sufficient. *Keip*, 332 Ill. App. 3d at 882, 773 N.E.2d at 1232. Cathy currently has three potential residences: the house in Davenport, Iowa, which she owns outright; the condominium in Moline, Illinois, for which she pays a monthly mortgage; and the apartment in Chicago, Illinois, which she is currently renting. Despite the fact that her son is living in her Davenport home, Cathy does not charge him any rent. Further, Cathy has not attempted to rent out her Moline condominium, but rather keeps it so "when [she is] there, [she is] there." Cathy is therefore ignoring two potential sources of income, while still paying off a mortgage on her Moline condominium and spending more funds on rent in Chicago.

Cathy has also done nothing to find employment of her own, despite having many years of experience as an office manager and bookkeeper. Cathy is not excused from attempting to become self-sufficient simply because Bill is a wealthy man. Cathy may have quit her job soon after the parties were married, but Cathy did not quit in order to assist Bill with his work. Cathy testified that she traveled and shopped, not that she conducted business. Cathy further did not forego any career opportunities on Bill's behalf, nor did the parties have any children at home. By finding employment at or about the same salary she had previously received ($25,000), renting out one or both of her properties, and investing her $826,000 property award, Cathy could cover her monthly expenses and have leftover funds at her disposal. We further note that Cathy is still receiving $15,000 a month in maintenance and will continue to do so through May 31, 2007. This sum of money will certainly provide Cathy with sufficient support until she does obtain employment. Cathy is correct that Bill will likely continue to have more disposable income per month; however, "there is no requirement in the law that the parties are to permanently maintain the same standard of living." *Haas*, 215 Ill. App. 3d at 964, 574 N.E.2d at 1379.

We also stress that the trial court did take an additional factor into consideration when determining Cathy's maintenance award, specifically that Bill had paid and would continue to pay over $450,000 in legal fees for Cathy. This additional award ensured that Cathy would not dip into her own funds in order to pay for her attorney and expert fees during this very lengthy litigation.

Cathy has considerable potential for income sufficient to meet her monthly living expenses as detailed by her financial affidavit. Cathy was awarded approximately $826,000 in marital and nonmarital property, which may earn considerable interest with modest investment, and a 1997 Mercedes automobile. Cathy has at least two income-producing real estate assets that she may take advantage of, as well as career potential that was not adversely affected by any marital demands. Further, Cathy's evidence supporting her claimed maintenance requirement of $46,000 per month is not credible and therefore does not justify an increase in maintenance.

Accordingly, the trial court's award of maintenance in the amount of $15,000 per month, terminable May 31, 2007, is not an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

SLATER, P.J., and HOLDRIDGE, J., concur.