CAROLYN QUINLAN, Plaintiff-Appellee, v. MARY ALICE STOUFFE *et al.*, Defendants-Appellants.

Fourth District   No. 4—04—0328

Argued December 8, 2004.—Opinion filed February 7, 2005.

Stephen F. Hedinger (argued), of Hedinger Law Office, of Springfield, for appellants.

Thomas H. Wilson and James G. Fahey (argued), both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In May 2003, plaintiff, Carolyn Quinlan, filed a complaint against defendants, Mary Alice Stouffe, Don Stouffe, and Linda Friend, seeking reimbursement for work done on a gravel driveway that is used by all parties. In August 2003, the parties attended a settlement conference to resolve the dispute. In September 2003, plaintiff informed defendants that "there will be no [a]greement." In October 2003, defendants filed a counterclaim, arguing that the parties had reached an agreement at the August 2003 meeting and plaintiff breached that agreement. In December 2003, the trial court conducted a bench trial. In January 2004, the court entered an order, finding that "an agreement may have been reached on August 4, 2003, that all parties attempt[ed] to modify that agreement and effectively withdrew from

that agreement." The court then found defendants had a duty to reimburse plaintiff and ordered defendants to pay their *pro rata* share of the repairs. In February 2004, the court considered and denied defendants' motion to reconsider and to modify and vacate judgment. Defendants appealed, arguing that the parties had reached a binding agreement and plaintiff later breached that contract. We affirm.

## I. BACKGROUND

The parties own tracts of land on a four-tract plat in Springfield, Illinois. Plaintiff Quinlan owns tract 4, commonly known as 1633 Tozer Road. Defendants Mary Alice Stouffe and Don Stouffe own tract 5, commonly known as 1615 Tozer Road, and defendant Linda Friend owns tracts 6 and 7, commonly known as 1563 Tozer Road. The parties share an easement in the form of a gravel driveway, which is in the shape of a "T". The parties use the easement to reach their respective residences and utilities. The driveway traverses the Stouffes' and Friend's properties before it reaches plaintiff's residence.

Between 2000 and 2003, the driveway's condition deteriorated as a result of both normal traffic and additional traffic during construction of plaintiff's garage and the Stouffes' house. By January 2003, the driveway had become almost impassable, with mud and clay on the road. Plaintiff contacted Donley, a professional contractor, for advice on repair. Donley made recommendations on the repairs needed. According to plaintiff, Donley told her that the last third of the road that enters her residence needed to have new gravel poured to prevent the mud from that portion of the road from ruining the beginning two-thirds of the road. On March 18, 2003, in the presence of plaintiff's husband, Ed Quinlan, Donley repaired the road by hauling and laying new gravel on the entire road. Ed Quinlan stated that the whole process took approximately 4½ hours and the repairs substantially improved the road. Ed Quinlan also stated that on March 17, 2003, the day before Donley's repair, he and a neighbor had spent over four hours grading the road. After the repair, plaintiff paid Donley $1,327.51 for his work.

On March 18, 2003, plaintiff sent letters to defendants, requesting a third share of the repair bill. Specifically, the letter stated, in pertinent part, as follows:

> "Our entrance road is 827 feet. From the Quinlan's drive south to Tozer Road is 522 feet, which represents 67% of the total length of the road. Therefore, the first ²/₃ on the south portion of our entrance road would be divided by all three homeowners. The north 275 feet, or the distance from the Quinlan's [*sic*] drive north to the Stouffe-Friend turnoff[,] represents 33% of the total entrance road, and that is divided equally between Linda and the Stouffes.

There were 30.34 tons of 2-inch crushed rock laid down first to provide a relatively smooth base over the old potholes. The cost for the 2-inch stone at $12.00 per ton came to a total of $364.08. Then the entrance road was resurfaced with #6 crushed stone and 87.13 tons was spread over the entire length of the road, with one footnote. Seven tons of the #6 was spread on the Quinlan's driveway at a cost of $577.00, which is not included in the remaining proportioning of the expenses.

The total cost paid for both the #6 and the 2-inch was $1,322.51. $77.00 of that is the Quinlan's [sic] expense for their driveway. Therefore, 67% of the remaining $1,244.51, which is $833.86, should be divided between all three families equally. This comes to $277.95 per family.

Continuing, the north third of the road[ ] (33% of $1,244.51) comes to a total of $410.68, which should be divided evenly between Linda and the Stouffes, and comes to $205.34. Therefore, Linda and the Stouffes each owe a total of $483.29. I would appreciate it if each of you could reimburse me sometime within the next 90 days."

On April 25, 2003, plaintiff's counsel sent letters to defendants, informing them that plaintiff would file a complaint to "recoup the costs of the repairs" and "also seek damages relating to the costs of the suit" if defendants persist in not reimbursing plaintiff for the repairs. Both defendants replied, stating in their letter that plaintiff repaired the road unilaterally despite the fact that defendants "never refused to commit to the repairs of the driveway." Defendant Don Stouffe also stated in his letter that prior to plaintiff's unilateral repair, defendants had indicated to plaintiff that "all parties should discuss reasonable accommodations that were fiscally compatible to all parties as this has been the mode of operation for the past seven years." In addition, defendants' letters stated that they did not believe that plaintiff, as a nonowner of an easement, can "dictate to the property owner the treatment of property" because "the owner or [sic] the dominant easement has the responsibility for maintain [sic] that easement."

On May 14, 2003, plaintiff filed the underlying lawsuit in small claims court, requesting defendants Stouffes and Friend each pay $483.29 for their respective shares of the driveway repairs. The court set the matter for trial on August 5, 2003. On August 4, 2003, the parties and their respective counsel met to settle the dispute. Following the meeting, plaintiff's counsel sent a letter to defendants' counsel, which included the following language: "[c]onsistent with this morning's settlement agreement, the trial in the above referenced matter has been rescheduled from August 5, 2003, at 1:30 p.m., until Wednesday, September 10, 2003, at 9:00 a.m."

On August 15, 2003, plaintiff's counsel faxed a draft "Settlement Agreement" to defendant's counsel. The draft included the payment of $278 each from the Stouffes and Friend to plaintiff and plaintiff's dismissal of the lawsuit. The draft also established a scheme for the parties to work together to discuss any future necessary repairs and a dispute-resolution mechanism.

On September 2, 2003, defendants' counsel sent a letter to plaintiff's counsel, stating, in pertinent part, as follows:

"My clients have reviewed the proposed settlement agreement, and we hereby tender the attached counterproposal, which we feel is more in tune with what we agreed to at our meeting at your office on August 4. Most of the agreement is consistent with yours, except for certain terms in paragraph 4."

On September 5, 2003, plaintiff's counsel informed defendants' counsel as follows:

"Please advise your clients that [p]laintiff will dismiss her suit with prejudice in return for a $278 payment made before Monday, September 8, 2003. There will be no agreement."

Defendants did not make the payments as plaintiff requested. On October 21, 2003, defendants filed a two-count counterclaim for enforcement of an oral settlement and a declaration of the parties' rights pursuant to the easement. Specifically, the counterclaim alleged that the parties "discussed and reached an oral agreement to resolve all issues involved in the complaint" and "plaintiff had failed to draft an agreement which reflected the parties' verbal agreement of August 4, 2003." Defendants also requested the trial court to "award to [d]efendants their damages and their attorney[ ] fees incurred in bringing this [c]ounterclaim."

On December 31, 2003, the trial court conducted a bench trial. Plaintiff first testified to the condition of the road and her arrangement with Donley. Plaintiff further stated that she decided to seek only $278 from both Stouffes and Friend for the repair on the first two-thirds of the driveway that was used by all parties. Plaintiff, however, offered no testimony regarding the August 4, 2003, settlement meeting.

Defendants also testified at the bench trial. Defendant Don Stouffe stated that, in his opinion, plaintiff's repair was too expensive because in previous years he had made repairs as needed. Over objection of plaintiff's counsel, defendant Don Stouffe also offered photographic evidence of the driveway and of the various items of equipment that he had used to repair the driveway. Don Stouffe also pointed out that, by the time of trial, the driveway already was in need of additional repair.

Defendant Don Stouffe then testified about the August 4, 2003, meeting. Plaintiff's counsel objected to the testimony, stating such statements were inadmissible as settlement negotiations. The trial court held that defendant Don Stouffe's testimony was admissible but was "subject to being stricken if I find there is no agreement." Don Stouffe stated that he believed the parties had reached an oral agreement. Specifically, Don Stouffe stated that the parties had agreed that defendants Stouffes and Friend would each pay $278 and plaintiff would dismiss the complaint with prejudice. In addition, the parties would meet annually each April to discuss road repairs. Don Stouffe, however, stated that plaintiff's August 15, 2003, draft "Settlement Agreement," which was supposed to clarify what the parties had agreed to, was not consistent with the parties' August 4, 2003, agreement. Specifically, Don Stouffe alleged that plaintiff's August 15, 2003, draft included two provisions that the parties did not agree to during the meeting: (1) a "standard of performance" based upon the United States Department of Transportation's Gravel Roads: Maintenance and Design Manual and (2) a requirement that only "licensed" persons could work on the driveway. Don Stouffe further alleged that the draft failed to clarify that, in the event of a disagreement, it was the minority voter who could obtain and pay for review by an independent third party.

Defendants Mary Alice Stouffe and Friend also testified. Both stated that they believed the parties had reached an agreement on August 4, 2003, and that the parties did not agree to a specific standard of repair. Defendant Mary Alice Stouffe, however, stated that the parties agreed that the driveway would be "passable."

Following the trial, on January 2, 2004, the trial court entered an order, which held as follows:

"The court finds that although an agreement may have been reached on 8/4/03 that all parties attempt[ed] to modify that agreement and effectively withdrew from the agreement. The court further finds the easement which covers the plaintiff and the defendants has a length of 827.19 feet[;] however[,] 275 feet of that presently reaches only the Stouffes and Friend and that the plaintiff has abandoned her claim for that part of the easement[;] hence[,] 66.75% of the easement has been improved."

The court then ordered the Stouffes and Friend each to pay plaintiff $294.26 for their one-third shares of the repair and denied the parties' request for attorney fees and court costs.

On January 20, 2004, defendants filed a motion to reconsider, modify, and vacate judgment. Defendants argued that the parties entered into a contract on August 4, 2003, and the parties' subsequent

action did not extinguish their contract. On February 25, 2004, the trial court denied defendants' motion, stating "[t]he letter of [September 2, 2003,] indicated that discussion was in flux." This appeal followed.

## II. ANALYSIS

On appeal, defendants argue that (1) a contract was formed because (a) the parties' oral agreement met all the legal requirements, (b) no essential terms were unaddressed, (c) negotiations were not in "flux," and (d) the parties did not withdraw from the agreement and (2) plaintiff breached the contract.

### A. Standard of Review

■ As this court stated in *Mulliken v. Lewis*, 245 Ill. App. 3d 512, 516, 615 N.E.2d 25, 27 (1993), when there is a factual dispute, the question of whether a contract exists is for the trier of fact to decide. A reviewing court will not overturn a trial court's finding of fact unless the appealing party can prove the findings were against the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or where a decision is unreasonable, arbitrary, and not based on any evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35, 787 N.E.2d 796, 815 (2003). However, if the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment by using a *de novo* standard of review. *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71, 755 N.E.2d 1, 9 (2001). Further, when the issue presented cannot be accurately characterized as either a pure question of fact or a pure question of law, a reviewing court should treat such an issue as a mixed question of law and fact, subject to the clearly erroneous standard. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369, 776 N.E.2d 166, 177 (2002). Under such a standard, a trial court's determination will be reversed only if, after review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Carpetland*, 201 Ill. 2d at 369, 776 N.E.2d at 177.

### B. The Parties Did Not Form a Valid Contract

#### 1. *Defendants' Testimony Regarding the Settlement Meeting*

Initially, the parties disagree on whether defendants' December 31, 2003, testimony concerning the August 4, 2003, settlement meeting was admissible. As stated above, the trial court ruled during the bench trial that defendants' testimony regarding the August 4, 2003, meeting was admissible but was "subject to being stricken if I find

there is no agreement." The court's order, however, did not indicate whether this testimony was stricken. The court only indicated it found an agreement "may have been reached" and even if there was an agreement, the parties effectively withdrew from the agreement.

■ On appeal, plaintiff's counsel argues defendants' testimony on this issue should be stricken. In support of this proposition, plaintiff's counsel cites *Nardi v. Kamerman*, 196 Ill. App. 3d 591, 554 N.E.2d 397 (1990), *Prewitt v. Hall*, 113 Ill. App. 2d 198, 252 N.E.2d 43 (1969), and *Gaslite Illinois, Inc. v. Northern Illinois Gas Co.*, 46 Ill. App. 3d 917, 362 N.E.2d 725 (1976). Plaintiff counsel's reliance on the above cases is misplaced. Plaintiff is correct that under Illinois law, matter relating to *offers* of settlement is ordinarily inadmissible. See *Kamerman*, 196 Ill. App. 3d at 596, 554 N.E.2d at 401; *Hall*, 113 Ill. App. 2d at 201, 252 N.E.2d at 44. This evidentiary principle, however, concerns the potential use of a party's offer of settlement as an admission of guilt and reflects the public policy that out-of-court settlement should be favored. See *In re Marriage of Passiales*, 144 Ill. App. 3d 629, 641, 494 N.E.2d 541, 551 (1986). In the instant case, the testimony in question contained no offer of settlement and was not related to either party's admission of guilt, and its admission would not discourage any future out-of-court settlement. Instead, the testimony directly relates to the issue that faces this court: whether the parties had formed a valid oral contract, and if so, the relevant terms of the contract. Such testimony is admissible.

## 2. *The Trial Court's Finding That There Was No Enforceable Contract*

■ In the instant case, the trial court stated in its order that "an agreement may have been reached on August 4, 2003, that all parties attempt[ed] to modify that agreement and effectively withdraw from the agreement." Such a statement indicated the court made no definitive finding that the parties formed an oral contract. A review of the record indicates the parties did not form a valid contract because defendants have failed to establish that the parties had a meeting of the minds on all material terms. In addition, the court correctly found that even if the parties reached an agreement, the parties' action after the August 4, 2003, meeting indicated that the parties effectively withdrew from that agreement.

As defendants correctly point out, oral agreements are binding so long as there is an offer and acceptance to compromise and there is a meeting of the minds as to the terms of the agreement. *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146, 685 N.E.2d 423, 424 (1997). For a contract to be enforceable, the essential terms of the contract must be

definite and certain. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314, 515 N.E.2d 61, 65 (1987). "However, a contract 'is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.' " *Midland Hotel Corp.*, 118 Ill. 2d at 314, 515 N.E.2d at 65, quoting *Morey v. Hoffman*, 12 Ill. 2d 125, 131, 145 N.E.2d 644, 648 (1957). Further, "[a]n enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract." *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30, 578 N.E.2d 981, 984 (1991).

In the instant case, the parties' actions after the settlement meeting indicated no mutual assent as to what the parties had agreed to do. The record indicated that after the settlement meeting, on August 15, 2003, plaintiff's counsel faxed a draft "Settlement Agreement" to defendant's counsel. On September 2, 2003, defendants' counsel replied with a "counterproposal," stating that defendants felt the "counterproposal" was "more in tune with what we agreed to." On September 5, 2003, plaintiff informed defendants' counsel that plaintiff did not agree to the counterproposal and offered to dismiss the lawsuit with prejudice for a $278 payment. Defendants then rejected that offer and filed a counterclaim in the trial court. Despite defendants' assertion that the parties had reached an agreement on August 4, 2003, the parties' actions indicated no such agreement.

Defendants argue that the parties had reached an agreement on August 4, 2003, and the terms of that agreement were ascertainable. Specifically, defendants argue that their September 2, 2003, version of the "counterproposal" settlement agreement "largely followed" plaintiff's August 15, 2003, draft settlement agreement and included "all terms" that the parties "specifically agreed to during the August 4 meeting." Defendants further claim that to the extent the two versions differ, the differences were not "essential terms" of the agreement. Defendants' assertion contradicts their own position on appeal.

During oral argument, defendants' counsel conceded that the focus of defendants' appeal is not their monetary obligations to plaintiff for the repair that plaintiff commissioned. Rather, defendants were interested in having a workable agreement so that the dispute in question does not occur again. As defendant Don Stouffe testified at the bench trial, the two drafts of the "settlement agreement" differed in the following ways: the required level of future repair for the driveway; the use of nonlicensed persons to work on the driveway; and in the event of a disagreement, the method of review by and payment for an independent third party. The record indicates that the legal ac-

tion in question originated from the parties' disagreement on the cost and quality of plaintiff's repair. Clearly, without an agreement on the required level of future repair and a mechanism for resolution of disputes, the parties could not have a workable agreement that would avoid future problems. Therefore, contrary to defendants' claim, the two existing draft "settlement agreements" differ in essential terms. Since a meeting of the minds between the parties occurs when there has been assent to the same things in the same sense on all essential terms and conditions, the parties here did not have a meeting of the minds on future repairs of the driveway. See *La Salle National Bank v. International Ltd.*, 129 Ill. App. 2d 381, 394, 263 N.E.2d 506, 513 (1970). As a result, the parties did not enter into a contract that had certain and enforceable essential terms.

Defendants also claim that the parties reached an oral agreement on August 4, 2003, and plaintiff's August 15, 2003, draft "settlement agreement" was a breach of that agreement. Specifically, defendants relied on the language in plaintiff's counsel's letter following the meeting—"[c]onsistent with this morning's settlement agreement"—to demonstrate that plaintiff and her counsel had also acknowledged that the parties had formed a valid and enforceable contract. First, plaintiff's counsel's "Settlement Agreement" designation does not necessarily indicate that a valid and enforceable oral agreement on all material terms had been reached. Second, defendants' counsel, in submitting defendants' version of the draft "settlement agreement," stated as follows:

> "My clients have reviewed the *proposed settlement agreement*, and we hereby tender the attached *counterproposal*, which we feel is more in tune with what we agreed to at our meeting at your office on August 4. Most of the agreement is consistent with yours, except for certain terms in paragraph 4." (Emphases added.)

Defendants' own language indicates that defendants acknowledged that on September 2, 2003, the discussion regarding the settlement was still ongoing and not yet finalized. Therefore, the parties did not reach a final agreement during the August 4, 2003, settlement meeting.

Regardless whether the parties believed they had reached an agreement, a contract is not valid without enforceable essential terms. The two draft agreements differ on the standard of future repairs and the dispute-resolution mechanism. Moreover, the record does not reflect which version the parties had agreed to during the settlement meeting.

Finally, even if the parties had reached an agreement on August 4, 2003, the trial court correctly found that the parties' attempt to modify that agreement indicated the parties "effectively withdrew from the

agreement." This determination involves both the factual finding as to the parties' conduct after the settlement meeting and the legal determination whether such conduct constituted a "withdrawal" from the agreement. Because the court's ruling involves a mixed question of law and fact, this court will not reverse the court's determination unless the court committed a clear mistake in its ruling. *Carpetland*, 201 Ill. 2d at 369, 776 N.E.2d at 177.

After the August 4, 2003, meeting, plaintiff's counsel first faxed a draft "Settlement Agreement" to defendant's counsel. Defendants' counsel then replied with a "counterproposal." Upon receiving the "counterproposal," plaintiff informed defendants' counsel that plaintiff did not agree to the counterproposal and stated "there will be no agreement." Plaintiff then offered to dismiss the lawsuit with prejudice for a $278 payment, which defendants rejected. Defendants then proceeded to file a counterclaim in the trial court. The parties' disagreement on the standard of repair and a dispute-resolution mechanism indicated that, even if the parties had formed a valid contract in the August 4, 2003, meeting, their later disagreement on essential terms of settlement rendered the original contract unenforceable. The trial court found that even though the parties may have reached an agreement earlier, they could no longer agree on what they would do in the future and had withdrawn from the alleged agreement. Such a finding contains no "clear mistake."

## C. The Trial Court Correctly Ordered Defendants To Reimburse Plaintiff for the Repair

A court's ruling on a mixed question of law and fact will not be reversed unless the court committed a clear mistake in its ruling. *Carpetland*, 201 Ill. 2d at 369, 776 N.E.2d at 177. The trial court's order of payment here was based on both the factual determination of plaintiff's costs in repairing the easement that was used by all parties and the legal determination of the parties' obligations. The court made no clear mistake, and its order is affirmed.

■ A "dominant estate" is defined as "[a]n estate that benefits from an easement." Black's Law Dictionary 567 (7th ed. 1999). A "servient estate" is defined as "[a]n estate [that is] burdened by an easement." Black's Law Dictionary 569 (7th ed. 1999). In the instant case, the easement at issue traverses over the property line of both defendants' properties, thereby making the property of defendants the servient estate. Plaintiff's property benefits from an easement on defendants' properties and is the dominant estate.

Generally, a dominant estate has both the right and duty to maintain the easement. See *Seymour v. Harris Trust & Savings Bank*

*of Chicago*, 264 Ill. App. 3d 583, 595, 636 N.E.2d 985, 994 (1994). However, if the easement is owned by more than one person, the duty to maintain it is apportioned between all owners based on the extent of the individual owner's use of the easement. *Lakeland Property Owners Ass'n v. Larson*, 121 Ill. App. 3d 805, 811, 459 N.E.2d 1164, 1169 (1984).

■ Therefore, when joint regular use of the easement is made by both the dominant and servient estates, both estates have the obligation to contribute jointly to the costs of reasonable repairs unless the easement itself indicates otherwise. See Restatement (Third) of Property § 4.13(1)(b) (2000). In addition, both estates may repair the easement provided one does not unreasonably interfere with the right of the other to also repair, nor render the easement less convenient or useful. See 28A C.J.S. *Easements* § 94, at 276 (1996); see also *McDonald v. Bemboom*, 694 S.W.2d 782, 786 (Mo. App. 1985); *Cohen v. Banks*, 169 Misc. 2d 374, 377, 642 N.Y.S.2d 797, 800 (1996). Such a duty to contribute, however, is dependent upon the reasonableness of the repair. Specifically, the repairing party must give the contributing parties adequate notification and a reasonable opportunity to participate in decisions regarding the repairs. See *Banks*, 169 Misc. 2d at 377-78, 642 N.Y.S.2d at 800, citing *Janes v. Politis*, 79 Misc. 2d 941, 944-45, 361 N.Y.S.2d 613, 617 (1974). Moreover, the repairs must be performed adequately, properly, and at a reasonable price. See *Banks*, 169 Misc. 2d at 377-78, 642 N.Y.S.2d at 800, citing *Janes*, 79 Misc. 2d at 944-45, 361 N.Y.S.2d at 617.

■ In the instant case, all parties own and use the easement. Therefore, plaintiff has the right and duty to maintain the easement, and defendants have the obligation to contribute jointly to the costs of reasonable repairs. Similarly, defendants also have the right to make reasonable repair to the easement in question and to demand proportionate contribution from plaintiff. The trial court's order correctly considered the total length of the easement, the portion that was used by all the parties, and the cost and the circumstance of the repair in question. The court's order that the Stouffes and Friend each contribute $294.26 to plaintiff contained no mistake and is affirmed.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and APPLETON, JJ., concur.