In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-4388

ASSOCIATION BENEFIT SERVICES,
INCORPORATED,

*Plaintiff-Appellant*,

*v.*

CAREMARK RX, INCORPORATED,
and CAREMARKPCS, a Delaware
Corporation,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3271—**Matthew F. Kennelly**, *Judge.*

_____

ARGUED NOVEMBER 2, 2006—DECIDED JULY 13, 2007

_____

Before BAUER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Association Benefit Services, Inc., ("ABS") brought this action against Caremark Rx, Inc., and CaremarkPCS (collectively, "Caremark"). It raised claims of fraud, unjust enrichment and breach of contract. Caremark filed a motion for summary judgment on all counts, which the district court granted. ABS appealed to this court. For the reasons stated in this opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A. Facts**

ABS is a company formed to facilitate contracts between pharmacy benefit managers ("PBMs") and organizations seeking administrators for their prescription benefit plans. AdvancePCS (now CaremarkPCS) is a PBM.[1]

In January 2003, Jerome Coppage, the then-President of ABS, contacted Christopher Lee, Vice President of Sales for AdvancePCS. Coppage described an opportunity for AdvancePCS to be the PBM for a plan to be offered to American Automobile Association ("AAA") members. He represented that ABS "could deliver" AAA to AdvancePCS. R.105-1, Ex.8 at 81. Over the next several months, Lee and ABS communicated regarding a proposal to meet AAA's requirements. At some point during this process, ABS contacted AdvancePCS and represented that AAA wished to meet and undertake further negotiations for PBM services. ABS arranged a meeting between Lee and AAA to occur on May 19, 2003.

On May 13, 2003, at the request of Coppage, and in apparent anticipation of the upcoming meeting with AAA, Lee sent a letter to ABS confirming AdvancePCS' intent to work with ABS to secure a contract with AAA. On May 19, 2003, immediately before the scheduled meeting with AAA, Lee met with Coppage and Jack Bestrom, a

---

[1] After the litigation commenced, AdvancePCS merged into a wholly owned subsidiary of Caremark Rx, and its name was changed to CaremarkPCS. We shall continue to use the name AdvancePCS, unless we are referring collectively to both entities or to Caremark as the corporate parent.

consultant to ABS, in a hotel near AAA's headquarters. Bestrom had drafted, by hand, a forty-page contract between ABS and AdvancePCS, but had been unable to complete a typed version of it prior to meeting with Lee and therefore abandoned the project. *See* R.105-1, Ex.9 at 95-96. Instead, Bestrom told Lee that ABS would need a document acknowledging that, if AdvancePCS became AAA's PBM, AdvancePCS was willing to pay to ABS commissions of $0.25 per prescription filled at a retail store and $1.50 per prescription filled by mail. Bestrom further told Lee that AdvancePCS would not be allowed to meet with ABS' "client," AAA, until Lee gave ABS such a document. R.105-1, Ex.8 at 92. Because the men had an appointment with AAA that very afternoon and, therefore, time was short, Lee edited the May 13, 2003 letter to Coppage to include a reference to the commission as requested by Bestrom. The men then drove to a nearby Kinko's to print the letter. As modified, this May 19, 2003 letter reads, in full:

Re: AdvancePCS Agreement—AAA

Dear Mr. Coppage:

I want to once again thank you for partnering with AdvancePCS for your prescription benefits management services. We are very excited about growing our relationship with Association Benefits [sic] Services, Inc. and look forward to working closely with you as we move forward. We will be working exclusively with you as we work toward delivering consumer card services with AAA.

For the length of time AdvancePCS delivers benefits to AAA, I want to confirm that we will be paying commissions to Association Benefits [sic] Services of $0.25 per retail claim and $1.50 per mail order claim.

Additionally, we commit to deliver unparalleled service and prescription benefits that will enhance the quality of membership in the organizations that you serve and to implement all groups expeditiously and efficiently. As the nation's largest and most clinically advanced prescription benefit management and health improvement company, we are confident that we will fully address your financial and customer service objectives.

We are dedicated to delivering the most innovative programs and plan efficiencies to each of our clients. With AdvancePCS as its partner, Association Benefits [sic] Services will realize the following benefits:

• We offer aggressive retail network pricing with a national, broad-based retail network.

• We offer aggressive mail order pricing with programs aimed at increasing generic utilization saving members even more money.

If you have any questions or comments, please feel free to contact me at [phone number and email].

Sincerely,

/s/ Christopher C. Lee
Vice President, Sales

R.105-1, Ex.5D.[2] The letter was printed on AdvancePCS letterhead and included Lee's electronic signature. According to Coppage's deposition testimony, Coppage himself

---

[2] With the exception of the sentence discussing the commissions and the word "[a]dditionally" at the beginning of the following paragraph, the May 19, 2003 letter is identical to the May 13, 2003 letter from Lee to Coppage. *Compare* R.105-1, Ex.5B, *with* R.105-1, Ex.5D.

signed the letter several days later, at home, and included a notation reading: "accepted and agreed this 19th day of May, 2003, by Association Benefit Services, Inc." R.105-1, Ex.8 at 99, Ex.5D. Coppage then forwarded the letter to Robert Blixt, the CEO of ABS. Lee later stated, in his affidavit submitted in support of summary judgment for AdvancePCS, that he modified the letter to include the commission structure based on his understanding that ABS was a consultant to AAA and that the revenue sharing fees requested by AAA, as ABS' client, would cover the commissions to ABS. R.105-1, Ex.5 at 6-7. After the men left Kinko's, Lee, Bestrom and Coppage met with representatives of AAA.

ABS claims that, in reliance on the letter, it not only facilitated the introduction to AAA and participated in the May 19, 2003 meeting but, over the course of the ensuing months, also assisted AdvancePCS in formulating a successful proposal to become AAA's PBM. ABS also claims that, in reliance on the letter, it did not work with rival PBMs to develop proposals for AAA's business.

AdvancePCS claims that, in the course of the development of the final proposal for AAA, ABS agreed to adjust its own fees to ensure the deal went through. All parties also acknowledge that AdvancePCS would have been under no obligation to pay ABS were it not for the successful completion of the agreement. Documents in the record, generated by both AdvancePCS and ABS, indicate that fee and compensation adjustments were topics of discussion in late May. These discussions took place after the meeting with AAA, and thus after Lee's letter was drafted. In particular, Blixt sent a conference call agenda to Lee listing compensation adjustments to ABS as one of several topics of discussion. R.105-1, Ex.5E. Lee sent an

email in June detailing a revised offer to AAA, including $0.15 in commissions to ABS. R.105-1, Ex.5J.

Also in June, Lee sent a letter to representatives of AAA that detailed a proposed division of responsibilities between AAA, ABS and AdvancePCS in the pharmacy card program. Notably, the letter laid out a *full page* of responsibilities for ABS, which included marketing the program to AAA members and traveling to assist local clubs in implementing and utilizing the program. All these services were to be provided at the expense of ABS. R.105-1, Ex.5K at 4. Several days later, Lee sent an email to Bestrom and Blixt, apparently reiterating information recently garnered from AAA: ABS was *neither* AAA's consultant *nor* its agent and that AAA would not sign a third-party agreement or "pay anything" to ABS. R.105-1, Ex.5L. On June 26, 2003, yet another email followed from Lee to Bestrom, Blixt and Coppage, this one stating, in pertinent part:

> . . . I was reading through my old files this week and need to re-tract [sic] the letter dated May 19th to Jerry re: AAA. In that letter I offered that we would pay ABS $0.25 per claim while we managed the AAA account. This doesn't make any sense any more in light of our on-going negotiations. I just want to point out that this is not in effect as we don't have any negotiated agreement with AAA or ABS. It isn't too big a deal, but I just wanted to clarify things. The contract that we sign with y'all and with AAA will reflect all the accurate financials and obligations.

R.105-1, Ex.5M.

AdvancePCS contends that, in the course of these "on-going negotiations," Lee offered commissions of $0.025 from AdvancePCS to ABS, and ABS verbally accepted. The

parties rely upon no record evidence in which ABS *directly* responded to these gradually decreasing commission levels; in particular, in response to AdvancePCS' submission of documents suggesting that ABS was willing to adjust commissions, ABS relies on no record evidence to demonstrate any continuing insistence upon the commission levels stated in the May 19, 2003 letter.

AdvancePCS eventually offered ABS a written contract including the $0.025 commissions, which ABS rejected. R.31, Ex.B; R.105-1, Ex.7 at 204. AdvancePCS and AAA entered into a contract for prescription benefit services in October 2003.

## B. District Court Proceedings

In March 2004, ABS instituted this action against AdvancePCS (now CaremarkPCS) and Caremark Rx in the Circuit Court of Cook County, Illinois. The complaint alleged various tort theories of recovery against the defendants arising out of their conduct in arriving at the AAA agreement. The defendants removed the action to the Northern District of Illinois on the ground of diversity of citizenship. In the district court, the claims eventually were amended to include fraud, breach of contract and unjust enrichment. Caremark filed motions for summary judgment on all counts; the district court granted the motions in their entirety on September 23, 2005.

### 1. Fraud

ABS first alleged that AdvancePCS was liable for fraud. ABS claimed that the May 19th letter and other statements made by Lee were misrepresentations intended to

induce ABS to forego negotiations with other PBMs and assist AdvancePCS exclusively in obtaining a contract with AAA. In analyzing this claim, the district court set out the standard for fraud under Illinois law: The defendant made a false statement of material fact, known or believed by the defendant to be false when made, with the intent to induce action by the plaintiff, and which did in fact induce such action, resulting in damages. R.140 at 8. The court further stated that promissory fraud, that is, fraud in which the defendant misrepresents *his own intent* regarding his future conduct in order to induce reliance on the part of the plaintiff, is actionable in Illinois only if part of a scheme to defraud. Illinois courts, the district court stated, have placed a "deliberately high" burden on plaintiffs in claims for promissory fraud. *Id.* at 9 (citing *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992)).

Evaluating the parties' summary judgment submissions, the district court concluded that ABS had failed to carry its burden with respect to the first element of a promissory fraud claim: a false representation of intent to fulfill the promise at the time the promise was made. In support of this element, ABS had submitted facts demonstrating AdvancePCS' actual *non-performance* of the obligations set out in the May 19th letter. Essentially, ABS sought to prove lack of intent *ab initio* as a reasonable inference drawn from AdvancePCS' ultimate failure to perform. The district court concluded that this theory constituted a wholly circular argument, insufficient to create a material fact as to the intent of AdvancePCS on May 19th. The only additional evidence in the record on the element of fraudulent intent, the court found, was testimony of Blixt that merely opined that, upon reflection, he did not believe AdvancePCS had any intention of

fulfilling the agreement. *Id.* at 9-10 (citing R.105-1, Ex.7 at 94-95). The court held that the "subjective speculation" of an ABS officer was insufficient to raise an issue of fact, and granted summary judgment on the fraud claim. *Id.* at 10.

### 2. Breach of Contract

ABS also claimed that the May 19th letter was a contract between the parties that AdvancePCS had breached. The court examined numerous alternative arguments of ABS on its contract claim: that the letter itself was an enforceable contract; that the letter was an offer, and that ABS accepted the offer; or, that the letter was an acceptance of a prior verbal offer by ABS to AdvancePCS.

The district court began its analysis of ABS' contract claim by stating that a party cannot prove a breach of contract without first demonstrating that a valid and enforceable contractual obligation exists. *Id.* at 10. On the facts before it, the court held that no reasonable jury could conclude that the May 19th letter was an enforceable contract because it lacked essential, definite and certain terms. Specifically, the court noted that Illinois law required a contract to "evidence a sufficiently concrete expression of the essential terms of the agreement and the parties' intent to be bound." *Id.* The district court determined that one of the essential terms required under Illinois law was "mutuality of obligation." *Id.* (citing *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153, 155 (Ill. App. Ct. 1971)).

Evaluating ABS' alternative argument that the letter was an offer, the district court found no evidence that Coppage's delayed signature "accepted" the offer because no evidence in the record supported the conclusion that

this purported "acceptance" was ever communicated to AdvancePCS. *Id.* at 11. The court further rejected ABS' assertion that it had accepted the letter in the offer by performance when it introduced Lee to the AAA representatives. Specifically, the court concluded that, because the claimed obligation of AdvancePCS would occur only if AdvancePCS secured a contract with AAA, the introduction was insufficient "performance" to constitute an acceptance. Moreover, the court thought it significant that Coppage had believed it necessary to *sign* the letter in order to create an enforceable agreement, and that this fact undermined ABS' contention that it had agreed to a contract by its act of escorting AdvancePCS into AAA. The court also noted that after the May 19th letter was written and the initial introduction to AAA made, AdvancePCS sent at least two revised offers to ABS, both of which would operate to terminate any previous unaccepted offer. Therefore, the court concluded, there could be no accepted offer as a matter of law.

ABS' final argument on its contract claim was that the letter was *AdvancePCS'* acceptance of a prior verbal offer by ABS. The court characterized this argument as "a last-ditch attempt to show that a genuine issue of material fact exists as to whether a contract was formed." *Id.* at 12. The court found that this theory was undermined by Coppage's signature and subscription "[a]ccepted and agreed," *id.*; such acceptance would have been unnecessary if the parties believed that an agreement had arisen by virtue of Lee's letter.

Finding no merit in any of ABS' contentions regarding contractual obligations arising out of the May 19th letter, the court entered summary judgment on the breach of contract claim.

### 3. Unjust Enrichment

As an alternative to its breach of contract theory, ABS requested a constructive trust on AdvancePCS' profits from its AAA contract on a theory of unjust enrichment. The court outlined the circumstances under Illinois law in which a plaintiff may seek a constructive trust on a benefit transferred to the defendant by a third party. It found that, of the permissible theories of recovery in these types of unjust enrichment claims, ABS had alleged only that AdvancePCS had procured a benefit from AAA through alleged fraudulent dealings with ABS. *Id.* at 12-13 (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). The court then concluded that its ruling on the fraud claim was dispositive on this issue and granted summary judgment for AdvancePCS.

### 4. Liability of Caremark Rx

Finally, the district court concluded that ABS had asserted no independent misconduct by Caremark Rx, but sought only to hold it liable for the acts of its subsidiary, CaremarkPCS (as the predecessor entity, AdvancePCS). Accordingly, the district court held that, because summary judgment was appropriate on all the substantive claims against CaremarkPCS, Caremark Rx, as the parent corporation, also was entitled to summary judgment.

## II

## DISCUSSION

In our de novo review of the order of the district court granting summary judgment, we must take the facts and all reasonable inferences from those facts in the light

most favorable to the non-moving party, here ABS. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate for Caremark, as the moving party, if it demonstrates that the record shows no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). ABS may not avoid summary judgment by resting on the allegations of its pleadings; it must come forward with specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the record taken as a whole could not permit a rational trier of fact to find for ABS, ABS has not demonstrated that a dispute of material fact exists and summary judgment must be granted to Caremark. *See Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006). Finally, we may affirm a grant of summary judgment on any ground that was preserved adequately in the district court. *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 659 (7th Cir. 2000).

This is a diversity action, and therefore our duty is to apply the substantive law of Illinois, as we believe the highest court of the state would apply it. *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001).

### A. Breach of Contract

The district court awarded summary judgment in favor of Caremark on ABS' breach of contract claim. It concluded that ABS had failed to demonstrate the existence of a valid contractual obligation sufficient to support a cause of action for breach. Under Illinois law, the elements of a breach of contract cause of action are "(1) offer and acceptance, (2) consideration, (3) definite and certain

terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006), *leave to appeal denied*, 850 N.E.2d 808 (Ill. 2006). Acknowledging that a breach of contract action must be predicated on a valid and enforceable contractual obligation, ABS disputes the district court's conclusion that no such obligation existed between the parties as a result of the May 19th letter. Specifically, ABS contends that the letter itself constituted the binding agreement of the parties, or, in the alternative, that the letter was an offer for a contract, accepted by ABS' performance in making the introduction of AdvancePCS to AAA.[3]

"The question of the existence of a contract is a matter of law for determination by the court." *Arneson v. Bd. of Trs., McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. Ct. 1991); *see also Robinson v. Christopher Greater Area Rural Health Planning Corp.*, 566 N.E.2d 768, 772 (Ill. App. Ct. 1991). No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance. *In re Marriage of Murphy*, 834 N.E.2d 56, 66 (Ill. App. Ct. 2005), *leave to appeal denied*, 844 N.E.2d 39 (Ill. 2005); *Quinlan v. Stouffe*, 823 N.E.2d 597, 603 (Ill. App. Ct. 2005); *Rose v. Mavrakis*, 799 N.E.2d 469, 473 (Ill. App. Ct. 2003); *see also* Restatement (Second) of Contracts § 33(1) ("Even though a

---

[3] On appeal, ABS does not press its argument that Coppage's signature constituted an acceptance of an offer in the May 19th letter.

manifestation of intention is intended to be understood as
an offer, it cannot be accepted so as to form a contract
unless the terms of the contract are reasonably certain.").
Accordingly, if the May 19th letter lacks the requisite
definiteness or certainty, it can constitute neither a con-
tract nor an offer sufficient to support ABS' breach of
contract action.

The definite and certain terms requirement serves sev-
eral important purposes, chief among them to ensure that
the parties in fact have reached an agreement and to
provide courts with a basis for enforcing the obligations
that the parties sought to impose upon one another. *See*
Restatement (Second) of Contracts § 33 & cmt. (a)-(b).
Under Illinois law, "a contract is sufficiently definite and
certain to be enforceable if the court is enabled from the
terms and provisions thereof, under proper rules of
construction and applicable principles of equity, to ascer-
tain *what the parties have agreed to do*." *Quinlan*, 823 N.E.2d
at 603 (citing *Midland Hotel Corp. v. Reuben H. Donnelley
Corp.*, 515 N.E.2d 61, 65 (Ill. 1987)) (internal quotation
marks omitted) (emphasis added); *see also DiLorenzo v.
Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 2004)
("A contract may be enforced even though some con-
tract terms may be missing or left to be agreed upon, but
if essential terms are so uncertain that there is no basis
for deciding whether the agreement has been kept or
broken, there is no contract."). Conversely, "an agreement
is not enforceable as a contract, because of its uncertainty,
when any of its essential terms are left unsettled." 12
Illinois Law and Practice § 8, at 254 (1983); *see also Wagner
Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956, 960 (Ill.
App. Ct. 1992) ("To be enforceable, a contract must show
a manifestation of agreement between the parties and

be definite and certain in its terms. When material terms and conditions are not ascertainable, there is no enforceable contract, even if the intent to contract is present.") (internal citations omitted). Parties do not have an enforceable contract unless, by the terms of the agreement, a court "can require the specific thing contracted for [] be done." *Hintz v. Lazarus*, 373 N.E.2d 1018, 1020 (Ill. App. Ct. 1978). Even where the parties have "manifested the intent to make a contract," failure of the definiteness and certainty requirements may make an agreement unenforceable. *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991).

We conclude that, as a matter of Illinois law, the letter of May 19th does not contain sufficiently definite and certain terms to constitute an enforceable agreement. Specifically, we conclude that, because the letter is silent on the issue of ABS' precise performance obligations and because those obligations are not set forth with the requisite specificity, any agreement is so lacking in its description of the exchange as to render it wholly unenforceable as a contract.

The case of *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981 (Ill. 1991), is particularly instructive. In *Academy Chicago*, the Supreme Court of Illinois provided guidance on what it considered to be essential terms, the absence of which precluded a finding of an enforceable contract. The *Academy Chicago* case arose out of a publication agreement between the widow of author John Cheever and a publishing company with whom she had entered into an agreement to publish a compilation of Cheever's stories. The publishing agreement at issue was executed with formalities not present here, and appeared to define with some specificity the nature of the parties' obligations; the

parties clearly intended to be bound to its terms. It had failed to define, however, certain terms about which the parties subsequently disagreed, including the length and content of the proposed book, relevant dates for delivery and style or manner of publication. The court held that those failures were sufficient to render the agreement unenforceable for lack of definiteness and certainty regarding *essential* terms to the agreement. The court further concluded that the trial court erred in supplying missing terms under the circumstances, where the agreement reached had "major unresolved uncertainties" such that it "did not constitute a valid and enforceable contract to begin with." *Id.* at 984.

The import of *Academy Chicago* is that it identifies how an agreement might fail as a contract for lack of definiteness and certainty under Illinois law. In this case, the requisite terms are quite obviously different than those in *Academy Chicago*, but the opinion of the Supreme Court of Illinois in that case instructs that even apparently detailed and formal agreements may fail for lack of certainty where they do not manifest mutual assent to *essential* obligations of the parties. Those essential obligations in *Academy Chicago* were important components of the parties' basic exchange of performances (fees in exchange for a book publication). In the present case, by contrast, there simply is no statement whatsoever of the consideration ABS will provide for the receipt of commissions.

Our conclusion that the letter is so lacking in definiteness and certainty is strengthened by ABS' arguments before this court. In three separate places in its opening brief, ABS characterized its obligations as involving more than a

business introduction.[4] At oral argument, however, counsel for ABS repeatedly stated that ABS' sole obligation was a business introduction; it refused to acknowledge that any further performance was required by the contract or within the contemplation of the parties.[5] The difficulty ABS faced in identifying its own contractual obligations is rooted in the fundamental deficiency in its case. Because "the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chicago Publishers*, 578 N.E.2d at 984. Moreover, as *Academy Chicago*

---

[4] *See* Appellant's Br. at 1-2 ("[ABS'] end of the bargain [was] *introducing AdvancePCS to American Automobile Association ("AAA") and fostering the negotiations . . . .*") (emphasis added); *id.* at 13 ("There was mutuality of obligation, in that ABS'[] part of the bargain was implied. Both parties of the agreement were bound. *ABS agreed to effectuate the introduction between AdvancePCS and AAA and foster negotiations.* In return, AdvancePCS agreed to pay ABS a specified amount for each prescription filled on behalf of AAA if it obtained the contract.") (citation omitted) (emphasis added); *id.* at 18 ("AdvancePCS gave ABS its written assurance detailing the commissions it would pay ABS if it obtained the AAA contract so that ABS *would introduce* its Vice President of Sales, Christopher Lee, to AAA *and continue helping AdvancePCS obtain the contract.* ABS had the contacts at AAA; AdvancePCS had none. AdvancePCS then refused to pay ABS the amount it agreed to pay it *for its efforts.*") (emphasis added).

[5] In any event, this latter contention is not borne out by the record. The parties apparently *did* anticipate some additional performance on the part of ABS, as expressed in the proposal sent to AAA detailing the division of responsibilities on the PBM program. *See* R.105-1, Ex.5K.

suggests, we ought not, under such circumstances, supply missing terms when their pronounced absence in the original agreement demonstrates a lack of mutual assent and the absence of an enforceable contract at the outset.[6] *Id.* ("It is not uncommon for a court to supply a missing material term, as the reasonable conclusion often is that the parties intended that the term be supplied by implication. However, where the subject matter of the contract has not been decided upon and there is no standard available for reasonable implication, courts ordinarily refuse to supply the missing term.").

In sum, without specification of ABS' basic obligations, the letter as a whole is insufficiently definite; it fails to reflect an agreement of the parties on the essential nature of their mutual obligations. For the same reason, we find unpersuasive ABS' contention that the essential term of its contractual obligations may be implied. *See Kraftco*, 274 N.E.2d at 155 (acknowledging that terms of a contract may be implied under certain circumstances, but limiting the application of that doctrine when, because of an agreement's uncertainty, the court would be required to "writ[e] the total contract for the parties"). Whatever

---

[6] We conclude that the absence of any reference to any obligations of ABS whatsoever in the May 19th letter renders its terms too uncertain to give rise to enforceable obligations. However, we decline to hold, as Caremark urged on appeal, that the absence in the May 19th letter of multiple terms included in a final proposed agreement to ABS necessarily demonstrates that the May 19th letter is too uncertain to constitute a contract. Illinois recognizes that preliminary agreements can be binding, where the parties intend to be bound by the terms contained therein. *Quake Constr. v. American Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990).

the outer limits of a doctrine of implied essential terms
would be under Illinois law, they plainly are exceeded
when the parties' conduct does not provide a reasonable
basis for implying, with the requisite specificity, the re-
turn performance for which Caremark bargained. The
Illinois authority cited by ABS does not permit this court
to write an agreement for the parties, selecting from among
the possible obligations to which ABS variously suggests
it was bound. *See Acad. Chicago Publishers*, 578 N.E.2d at
984. As a matter of law, the letter fails to express a valid,
contractual obligation.

Because the lack of certainty and definiteness in terms,
express or implied, prevents the letter from serving as a
contract itself, and because it likewise prevents a con-
clusion that it was an offer accepted with sufficient speci-
ficity to give rise to a contract, we affirm summary judg-
ment for Caremark on the breach of contract claim.

**B. Fraud**

Summary judgment also was entered for Caremark on
the fraud claim. Under Illinois law, to establish actionable
fraud, a plaintiff must prove

> that defendants, with the intent to induce plaintiffs to
> act, made a false statement of material fact which
> defendants knew or believed to be false. Plaintiffs must
> also show they justifiably relied on the statement and
> suffered damages resulting from that reliance. Most
> importantly, fraud must be proved by clear and con-
> vincing evidence.

*Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613,
619 (Ill. App. Ct. 1995) (internal citations omitted); *see*

*also Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980). The general standard for fraud refers to a false statement of material fact; promissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud. *Bradley Real Estate Trust v. Dolan Assocs. Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994); *Gen. Elec. Credit Auto Lease v. Jankuski*, 532 N.E.2d 361, 363-64 (Ill. App. Ct. 1988).

The parties dispute whether ABS has satisfied the "scheme" exception to the bar on promissory fraud and whether this prong imposes any additional meaningful burden on a plaintiff proceeding in Illinois courts. Caremark also contends that any argument regarding the existence of a scheme has been forfeited. We need not decide this issue because we hold that the fraud claim must fail for another, more basic reason. A claim for fraud, promissory or otherwise, requires a showing that, *at the time the allegedly fraudulent statement was made*, it was an intentional misrepresentation. For promissory fraud claims, this requirement means that, when the promise was made, the promisor had no intent to fulfill it; if the promisor simply later changed his mind, an action for fraud will not lie. *See Doherty v. Kahn*, 682 N.E.2d 163, 176 (Ill. App. Ct. 1997), *abrogated on other grounds*, *Byung Moo Soh v. Target Mktg. Sys.*, 817 N.E.2d 1105 (Ill. App. Ct. 2004) ("'Promissory fraud' is a form of fraud based upon a false representation of intent concerning future conduct, *e.g.*, a promise to perform a contract when there is *actually no intent to perform* the contract.") (emphasis added).

Before the district court on summary judgment, ABS based its argument relating to AdvancePCS' *intent* to defraud at the time the statement was made on evidence

that AdvancePCS ultimately did not fulfill its promise and that "reflecting back," one of ABS' witnesses, Blixt, believed "that at the time defendant had no intention of honoring the agreement it committed to." R.134 at 26-27. On this evidence, ABS has not created a genuine issue of triable fact as to AdvancePCS' intent. Illinois law does not allow the plaintiffs to proceed on a fraud claim when the evidence of intent to defraud consists of nothing more than unfulfilled promises and allegations made in hindsight. *See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (holding that proof that a promise was not kept "alone is insufficient to make out a claim of promissory fraud, since there is no proof that the defendants made the promise never intending to keep it").

Before this court, ABS further contends that the language of the May 19th letter itself, as well as the rushed circumstances under which it was drafted, are further evidence that AdvancePCS had no intention of fulfilling any obligations. Moreover, ABS claims that Lee admitted in his affidavit that he never intended to pay ABS; ABS' support for this claim is Lee's statement that he understood that the commissions to ABS constituted a percentage of the amounts due to *AAA* under the contract to be signed, not a separate line-item to ABS. These contentions, not presented in opposition to summary judgment, have been forfeited. In any event, they are insufficient to prevent summary judgment on an element of a claim, such as fraud, that ultimately must be proven by clear and convincing evidence. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 856 (Ill. 2005), *cert. denied*, 74 U.S.L.W. 3501 (U.S. Mar. 6, 2006) (No. 05-842), (noting the legal presumption that transactions are fair and the resultant rule that common law fraud claims under Illinois law must be

proved by clear and convincing evidence); *Anderson*, 477 U.S. at 254 (confirming that a court "must view the evidence presented through the prism of the substantive evidentiary burden" in determining whether a genuine issue of fact has been raised sufficient to withstand summary judgment). Lee's affidavit does not state that he did not intend to fulfill a promise to pay; it affirmatively states that he *did* intend to follow through with the commissions in the letter, but that he believed the source funds for the payments would be included within the fee sharing request made by AAA. *See* R.105-1, Ex.5 at 7; *cf. Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 460 (N.D. Ill. 1989), *aff'd*, 932 F.2d 601 (7th Cir. 1991) (holding that an admission from the promisor that he lacked intent to form a contract by his promise could provide clear and convincing evidence sufficient to support a jury verdict in favor of a plaintiff on a promissory fraud claim).

Because ABS has failed to raise a genuine issue of fact as to fraudulent intent, we affirm summary judgment for AdvancePCS on this claim.

### C. Unjust Enrichment

Finally, summary judgment was entered against ABS on its claim that AdvancePCS was unjustly enriched by its dealings with AAA to the detriment of ABS.

Illinois law recognizes a claim for unjust enrichment where a benefit was transferred to the defendant by a third party in three situations:

> where (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of

wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*HPI Health Care Servs.*, 545 N.E.2d at 679 (internal citations omitted).

The district court rejected ABS' unjust enrichment claim, which was based on the alleged wrongful conduct of AdvancePCS; the court held that because the claim of fraud failed, ABS had not demonstrated the necessary element of wrongdoing.[7] ABS counters that Illinois law does not require that the wrongdoing necessary to state a claim for wrongdoing-based unjust enrichment rise to the level of actionable fraud.

In reaching its determination, the district court relied on *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430 (7th Cir. 1996).[8] In *Athey*, we considered a grant of summary

---

[7] Although we acknowledge that the wrongful conduct predicate to unjust enrichment is not an absolute requirement in Illinois, *Norton v. City of Chicago*, 690 N.E.2d 119, 126 (Ill. App. Ct. 1997), it is the only theory of unjust enrichment included in ABS' response to the motion for summary judgment in the district court. *See* R.134 at 27-28. We, therefore, limit ourselves to consideration of this theory.

[8] ABS objects that *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430 (7th Cir. 1996), should not control because, although it is a decision of this court that interprets and applies Illinois law, it did not cite any Illinois precedent in support of this particular aspect of its unjust enrichment holding. The difficulty with this part of ABS' contention is that none of the authority from Illinois that it cites contradicts the conclusions about Illinois law drawn by this court in *Athey*. We see

(continued...)

judgment for the defendant where the plaintiff also had raised claims, as ABS does here, of fraud and unjust enrichment under Illinois law. In disposing of the unjust enrichment claim, we stated:

> Athey was required to prove that Harris unjustly retained a benefit to Athey's detriment, and that Harris' retention of that benefit violates fundamental principles of justice, equity, and good conscience. In the absence of clear and convincing evidence of fraud by Harris, we cannot say that Harris unjustly retained a benefit and was thus unjustly enriched. Athey's unjust enrichment claim was properly dismissed.

*Athey Prods.*, 89 F.3d at 436. This court's conclusion was that, where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.

We see nothing erroneous in this conclusion. We already have acknowledged that, under Illinois law, fraud is not an indispensable element of an unjust enrichment claim. *See supra* note 7; *see also HPI Health Care Servs.*, 545 N.E.2d at 679 (outlining the various theories that could support an unjust enrichment claim under Illinois law). In *Athey* and again in the present case, we merely conclude that, when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and

---

8  (...continued)
no reason why this court's interpretation of Illinois law did not bind the district court absent Illinois authority to the contrary.

we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable.

ABS points this court to no Illinois authority requiring a contrary conclusion. Indeed, our survey of the relevant Illinois precedent indicates that Illinois courts have held that conduct rises to the level of *wrongful*, in the context of an unjust enrichment claim, when it violates the law.[9] We already have held, in the context of the fraud claim, that ABS has not produced sufficient evidence to create a triable issue of fact on the question of deception, resting instead on what it believes should be inferred from an unfulfilled promise. We therefore conclude, consistent with our holding in *Athey*, that ABS has failed to create

---

[9] *See, e.g.*, *Charles Hester Enters., Inc. v. Illinois Founders Ins. Co., Inc.*, 484 N.E.2d 349, 354 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (stating that unjust enrichment "is a condition that may be brought about by unlawful or improper conduct *as defined by law*, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct") (emphasis added); *see also In re Estate of Vogel*, 684 N.E.2d 1035, 1037 (Ill. App. Ct. 1997) ("Generally, a court imposes a constructive trust," the relief sought in this unjust enrichment claim, "to remedy (1) actual or constructive fraud; (2) the breach of a fiduciary duty; or (3) duress, coercion, or mistake."); *Alliance Acceptance Co. v. Yale Ins. Agency*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995). Moreover, even if it were the case that Illinois courts would not require a showing of actionable fraud to establish wrongdoing, ABS has not identified *other* wrongful conduct to support its claim in this case. *See* Appellant's Br. at 18 (stating that the "jury should decide whether AdvancePCS *was* unjustly enriched *by its deception*") (emphasis added).

a genuine issue of fact as to the element of wrongdoing necessary to support its claim of unjust enrichment.

Therefore, we conclude that the district court was correct in ruling that, under the circumstances present here, resolution of the fraud issue was dispositive of the unjust enrichment claim as well.

### Conclusion

Accordingly, we affirm the judgment of the district court, granting summary judgment to Caremark on ABS' claims for breach of contract, fraud and unjust enrichment.

AFFIRMED

A true Copy:

      Teste:

                                 _____

                             *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*