NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220852-U

NO. 4-22-0852

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SHAWNNA S. W., | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Woodford County |
| ERIC D. W., | ) | No. 17D46 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the denial of a petition for an order of protection under the Domestic Violence Act of 1986. The trial court's determination instances of conduct alleged in the petition were not abuse and were caused by a medical issue that had since resolved was not against the manifest weight of the evidence.

¶ 2    On November 15, 2021, the trial court entered an emergency order of protection

under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2020))

in favor of respondent, Eric D. W., against petitioner, Shawnna S. W., prohibiting Shawnna from

contacting Eric or their minor children. The order arose from an incident on September 21, 2021,

during which Shawnna behaved erratically and was transported to a local hospital for a mental-

health evaluation. On November 15, 2021, the trial court granted an emergency order of

protection, which it extended multiple times without objection. On August 23, 2022, the court

denied Eric's request for a plenary order of protection, finding no abuse occurred and Shawnna's behavior arose from a medical condition that had since been identified and resolved. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4            In September 2021, operating under a joint parenting plan, Shawnna was the primary residential parent of the parties' two daughters, S.W., then 13 years old, and E.W., then 11 years old. On November 3, 2021, Shawnna filed a petition for a finding of abuse of allocated parenting time alleging, since September 21, 2021, Eric refused to return the children to her or comply with the parenting plan. The record shows Shawnna also has a son, Kadin, then age 22, fathered by another man, and a young child, N.F., fathered by Shawnna's then boyfriend Brandon. Throughout the proceedings, the parties disputed whether Brandon was still Shawnna's boyfriend.

¶ 5            On November 15, 2021, Eric filed a petition for an order of protection alleging, on September 21, 2021, the police went to Shawnna's home to conduct a welfare check. He alleged Shawnna was in a state of fear and hysteria and behaving erratically, which had a profound effect on the children. Emergency medical services (EMS) transported Shawnna to a local hospital for a mental-health evaluation, and emergency responders told him the children were not safe at home with Shawnna in her current state of mind. Eric also alleged Shawnna exhibited erratic and odd behavior, raising mental-health concerns, on various dates beginning in April 2021. He alleged, after September 21, 2021, he attempted supervised parenting time, during which Shawnna "yelled" and "screamed," and Shawnna further harassed him by text messages and came to his house "four to five times a week," "screaming and acting erratic."

¶ 6         The trial court entered an emergency order of protection, placing primary care of the children with Eric and prohibiting Shawnna from communicating with Eric or coming within 500 feet of him. The court reserved a determination of parenting time until a later hearing.

¶ 7         On November 22, 2021, the trial court entered an interim order of protection, allowing Shawnna telephone or video calls with the children three days per week and attendance at extracurricular activities, provided she had no communication with Eric. The court set the order to expire on January 4, 2022. Beginning on January 4, 2022, the court extended the interim order multiple times, either by agreement of the parties or without objection from Shawnna. The order also allowed supervised visitation as recommended by the children's counselor.

¶ 8         In March 2022, Eric filed a motion *in limine* to exclude evidence not disclosed during discovery. The trial court granted the motion. Eric also moved to modify child support. On April 29, 2022, Shawnna filed a response to the petition for an order of protection, admitting "on September 21, 2021, she experienced a psychological episode due to a dangerously low potassium level, due to a recent COVID 19 illness." She admitted she was held in psychiatric care until her potassium levels were brought back to normal. She generally denied the remaining allegations of Eric's petition and alleged Eric interfered with her visitation with the children.

¶ 9         On April 29 and June 27, 2022, the trial court held a hearing on the merits. There is no transcript of the hearing in the record, but the trial court certified a bystander's report of the proceedings. Thus, the following facts are derived from the bystander's report.

¶ 10         The police report, ambulance report, and photos of Shawnna's home from September 21, 2021, were admitted into evidence by stipulation in lieu of testimony. The trial court admitted a document concerning Shawnna's hospital admissions without objection. The court also admitted various medical records.

¶ 11    The police report of September 21, 2021, prepared by officer Daniel Boles, showed, on September 21, 2021, at around 5 p.m., officers were dispatched to Shawnna's home for a welfare check. Upon arrival, several individuals starting running away from the house and waving to the officers to come to them. The individuals broke up into two groups; one group consisted of Kadin, his girlfriend Taylor, S.W., and E.W. The other group consisted of Shawnna, Brandon, and N.F. Brandon told Boles there was a problem between Shawnna and Brandon concerning a safe, which had been removed from the home and was lying on a sidewalk in the yard. There was a verbal exchange between the two groups, with each placing the blame for the incident on each other. Boles also wrote there was clear hostility between Shawnna and Taylor, whom Shawana believed was responsible for calling the police.

¶ 12    Boles spoke with Shawnna. Her speech was frantic, and her story was expansive and whimsical. She spoke of a man who was in her home a few nights prior to retrieve items from a safe and stated she pulled out a cold beer, left it on the counter, and begged him not to hurt her and her child. She told Boles she did not call 911 because she was ashamed of the condition of the home and did not want anyone to see it. Shawnna then told Boles about a recent drive to Elmwood, Illinois, where she encountered the funeral procession of a man who died in a motorcycle accident. Shawnna said she let the car do the driving and was supernaturally drawn to the man in the casket of the hearse. Shawnna also spoke about visions and said, on her recent car ride to Elmwood, she encountered the devil in snake form while N.F. was urinating on the side of the road. Boles described Shawnna's body as constantly in motion. Shawnna indicated she needed money to get away from Brandon and told Boles Brandon had installed a tracker on her vehicle. Boles noted it was apparent Shawnna was in distress and, as her level of fear and hysteria worsened, it had a profound effect on the children who were present.

¶ 13        Jim Dotter, an intake specialist for mental-health services, arrived and recommended transport to a hospital for a mental-health evaluation. EMS arrived, and paramedic Tim Strong opined the children were not safe at home with Shawnna in her current state of mind. Shawnna was unwilling to release her embrace of N.F. and resisted getting into the ambulance. However, after some time and encouragement, she complied, and N.F. was picked up by Cheryl Thomas, N.F.'s grandmother. S.W. and E.W. left with Kadin. After Shawnna left in the ambulance, Boles checked the house. He did not find any forced entry, but the entire area was chaotic. Items were strewn throughout the house. Photographs in the record confirm Boles's observations about the condition of the home.

¶ 14        Strong reported he came to the scene in response to a behavioral emergency. Shawnna was uncooperative and agitated. She denied thoughts of self-harm. EMS transported Shawnna to a hospital, where staff noted she was delusional and hallucinating and diagnosed her with unspecified psychosis not due to a substance or known physiological condition, hypokalemia (low potassium), and suspected exposure to COVID-19. The hospital prescribed acetaminophen, potassium chloride, and olanzapine. The record also indicates Shawnna was prescribed Haldol and Ativan.

¶ 15        On September 23, 2021, Shawnna was admitted to inpatient behavioral healthcare at another hospital and released the same day. Shawnna reported she did not know why she was there and stated she thought she was perhaps a little more paranoid than normal because her potassium was low. The consultation notes for Shawnna's visit described her as a female patient with an unknown previously diagnosed psychiatric history who was admitted to inpatient psychiatric treatment for acute stabilization. The notes stated she did not exhibit any acute symptoms of acute psychosis following repletion of "K+." The report further stated Shawnna did

not require current psychotropic medication. However, the notes also stated Shawnna remained an acute risk to harm herself, and the hospital discharged her to her mother with plans for an outpatient psychotherapy follow-up.

¶ 16    S.W. testified Shawnna had "been acting weird for a long time" and stated she did not feel safe with her. S.W. testified about various instances in which Shawnna scared her or made her uncomfortable. For example, S.W. testified about events during which Shawnna "would just drive around with no point." S.W. would ask where they were going, and Shawnna would say, "just trust her," and they would "not end up really going anywhere." Instead, they would just "end up back home, after taking turns and turns for 30 to 45 minutes driving in the country." S.W. also recounted when they crossed a bridge, Shawnna said, "I bet you girls wish I would jump off this bridge." S.W. testified Shawnna also spoke about Satan and death and would say she saw the devil in snake form, scaring S.W. and E.W. A few weeks before September 21, 2021, Shawnna texted S.W. and asked her to make sure she locked the doors because Shawnna had a bad feeling something was going to happen to them. S.W. described another incident, possibly in August 2021, where Shawnna laid on the bed all day in only a towel saying things like, "please don't take him away." Between June and September 2021, Shawnna said she heard someone break into the basement and said she was too scared to look.

¶ 17    S.W. stated she did not like Brandon and said he and Shawnna fought constantly. Although she had never seen Brandon be physical with Shawnna, S.W. recounted an incident where she saw Brandon grab Kadin by the throat. During the summer of 2021, Kadin removed a tracking device from Shawnna's car that Brandon had placed on it. S.W. also testified about other incidents in which Brandon made her feel uncomfortable.

¶ 18        Regarding September 21, 2021, S.W. testified Shawnna picked up her and E.W. after school and drove to the doctor's office so S.W. could have a physical exam for school. After leaving the doctor's office, S.W. asked Shawnna if they could get food from McDonald's, but Shawnna said no, because, "[w]e have to do something. Just trust me." Shawnna then drove to a bank to make a money transaction. Afterward, Shawnna drove to another bank in another town to make another money transaction, which S.W. thought did not make sense. S.W. texted Kadin's girlfriend, Taylor, that Shawnna was acting strange. When they arrived at Shawnna's house, Shawnna went inside and got a pair of earrings belonging to Kadin's daughter and took them over to the neighbor's house. Kadin arrived with Taylor, and S.W. and E.W. immediately got into Taylor's car. Meanwhile, Kadin saw a safe sitting by the front door and went to help Shawnna to move it to the curb. The police then arrived. Shawnna began yelling at Kadin and Taylor, telling them, "this is all your fault." She then started yelling about a battery on the ground that had fallen from the safe, telling everyone to get away from it because it was going to explode. When the police placed the battery in a garbage can, Shawnna yelled the garbage was going to explode and stated, "[t]his is my [v]ision. Run away from the house." S.W. and E.W. were scared and ran to the side of the road by Taylor. S.W. testified Shawnna was not making sense, and she was scared and confused about it. She and E.W. left with Kadin and drove to Eric's house.

¶ 19        From September 21, 2021, to the issuance of the order of protection, Shawnna attempted to see S.W., and S.W. refused. Eric supported that decision. When asked about events after September 21, 2021, S.W. stated that things were not going well. She said there was a lot of tension at meetings with Shawnna. At the first meeting, in the fall of 2021, Shawnna pretended like nothing happened. S.W. said when she and E.W. tried to talk to Shawnna about the incident,

Shawnna said she would talk to them about it at a proper time and accused Eric of brainwashing S.W. At a meeting one week later at a coffee shop, Shawnna told S.W. and E.W. to get off their phones and asked Eric to take the phones from them. S.W. did not want to give up her phone because otherwise she would have to talk to Shawnna. S.W. stated she still did not feel safe around Shawnna and would not feel safe again unless Shawnna apologized for the events, took responsibility for them, and got help. She said she would like a relationship with "pre-Brandon" Shawnna.

¶ 20        On cross-examination, S.W. acknowledged she always calls Shawnna by her first name, stating she does not feel like Shawnna deserves to be called "Mom" because of all the things they have gone through. S.W. testified she and E.W. are afraid to be alone with Shawnna. She said Shawnna continuously tries to have a relationship with her, but S.W. does not want one and does not want to talk to Shawnna on the phone. During 2022, she had been seeing Shawnna and N.F. every Sunday but said she tries not to talk to Shawnna and spends the time with her sister instead. She admitted there were things they did during the summer of 2021 that were fun and during which she was not afraid of Shawnna.

¶ 21        Kadin testified his relationship with Shawnna had gone drastically downhill due to her relationship with Brandon. On September 21, 2021, Kadin said he was at work and learned Shawnna gave away earrings to a neighbor that she was supposed to be keeping for his daughter when she got older. When he arrived at Shawnna's house with Taylor, the girls immediately got into the car. Shawnna approached Kadin and said, "[t]ime is coming, the [e]nd is [n]ear." Both Taylor and Shawnna's mother called the police. Kadin went to get the earrings back from the neighbor and then helped Shawnna take the safe out of the house. As they exited the house and started going down the porch stairs, Shawnna changed her mind about removing the safe and

wanted to bring it back into the house. Kadin testified Shawnna jumped on the safe and it fell down the porch stairs onto the concrete, broke, and a battery from the locking system fell out. Shawnna then started yelling the battery was going to explode, and the police arrived. Kadin testified it was chaotic, and the girls were scared and upset. On cross-examination, Kadin admitted he also retrieved an air compressor from the garage and used it to "bash" the safe and "snapped" fishing poles during the incident. He acknowledged Shawnna did not ask him to break into the safe and said his frustration was boiling over. He further admitted his behavior "freaked his sisters out" and said he could not defend his actions that day.

¶ 22        Kadin testified he witnessed other incidents. For example, a week earlier, Shawnna texted him late one evening stating she heard a noise in the basement and believed someone had broken into the home. During the summer of 2021, Shawnna also acted very strange at family dinners. Kadin believed Shawnna was acting strange because of her issues with Brandon. He testified he knew Brandon had placed a tracking device on Shawnna's vehicle, which Kadin discarded in a dumpster behind Walmart. Kadin testified about his poor relationship with Brandon and described an incident in approximately January 2020, during which Brandon put his hands around Kadin's throat. Kadin said the girls were present when it happened, and S.W. witnessed it.

¶ 23        Kadin testified he was concerned for his sisters. He said Shawnna was not the same mother she used to be. Kadin had not talked to Shawnna about the events of September 21, 2021. He testified he does not want a relationship with Shawnna moving forward. Kadin did not agree Brandon had moved out of Shawnna's house. However, he also said he knew Brandon was not living at Shawnna's house in September 2021, and he had changed the locks on Shawnna's door at her request in order to lock Brandon out.

¶ 24　　　　Eric testified, between June and September 2021, S.W. and E.W. told him about Shawnna's behavior and the incidents S.W. testified about. On September 21, 2021, he met Kadin and the girls at his home. He said everyone was upset, with S.W. in tears and E.W. so upset she was stuttering. A Department of Children and Family Services (DCFS) investigator contacted him the next day and said, until they investigated the situation, Eric should not let the girls go back with Shawnna. An investigator met with the girls at school the following week. Eric said the DCFS investigator told him the girls needed a period to "cool off" and to get counseling. With counseling, the girls could work through their fears and ease back into Shawnna's house over time, starting with supervised visitations. The investigator said his report would be completed and sent out in the mail, but Eric never received the report and his attempts to contact the investigator were unsuccessful. Eric stated, although he had not heard back from DCFS, Shawnna kept texting him stating she was "cleared" and demanding to see the girls. Eric testified Shawnna also continuously showed up at his house and would yell and say nasty things about him, which continued until he filed for the order of protection.

¶ 25　　　　Eric said he took the girls to weekly visits with Shawnna and would try to give space to them. He was not always able to hear what was being said but agreed it appeared to be much like S.W. described. He said he made the girls keep trying to meet with Shawnna when they refused. Regarding the meeting at the coffee shop, Eric testified Shawnna yelled and blamed him for the situation, causing the girls to become upset and start crying. Because the meetings were getting progressively worse, he decided to give the girls a break from the meetings. When asked if the girls had gotten counseling, Eric stated they were in individual counseling, but he said it was "not helpful to the family dynamic." He had attempted family counseling but was told to wait, and Shawnna was not cooperative.

¶ 26    Eric testified the current weekly meetings were not going well. He said since September 21, 2021, Shawnna consistently badgered him at his home to see the girls, ringing the doorbell and yelling through the door, and she texted him about S.W.'s behavior. He also said the girls did not feel safe and are not healing. Eric stated he encourages the girls to talk to Shawnna and disciplines them when they are disrespectful.

¶ 27    Shawnna testified, when she arrived home on September 21, 2021, Kadin was there and started searching through her van. Shawnna told him there was not another tracker on it. Kadin then went up the porch steps to the house and started pulling a safe out of the house. Shawnna told him to leave the safe there because Brandon was going to get it. However, Kadin said he did not care if he had to roll it, it was going to the curb. Shawnna said she begged Kadin to stop. Once the safe reached the steps, Shawnna jumped on top of it to stop Kadin from pulling it, but Kadin pulled Shawnna and the safe down the steps. Kadin next went into the garage, where he snapped one of Brandon's fishing poles over his knee and then came out with an air compressor. Kadin started bashing the safe with the air compressor so hard parts of it broke, including the safe's battery, which was damaged and spilling acid.

¶ 28    Shawnna testified "things got really crazy then." She said she felt nervous and anxious, and she worried the battery acid being near the compressed air could cause an explosion. She admitted it was an irrational worry. Taylor started to scream and cry, and people started coming out of their homes to see what was going on. When the police arrived, Shawnna was taken to one side of the yard and Kadin, Taylor, S.W., and E.W. to other areas for questioning by the police.

¶ 29    Shawnna stated she remembered everything from September 21, 2021. She denied hallucinating, but she admitted she said irrational things. She said she had never felt that way

before and was "not of her baseline" at the time. She was more anxious than normal because there was a lot going on. She had trouble sleeping during that time and had been sick with COVID-19 in August, during which she had a fever for two weeks and lost 12 pounds.

¶ 30        Shawnna also denied having any of the other visions or episodes that S.W. attributed to her. She said there was some truth to the things in the police report, but most of the information was out of context. Shawnna denied seeing Satan in snake form. She testified S.W. and E.W. kept using words like "stupid" and "butthole" around N.F. Shawnna told S.W. and E.W. they needed to get back to church and act more consistently with what God would want and not what the devil would want. She told the girls, "as a Christian, Satan is real." Shawnna said the conversation had been about being nice to each other and using appropriate words. Shawnna testified she was concerned something might be in the safe after she heard a sound in the basement that scared her, but it turned out to be a fallen ceiling tile. When asked about giving away expensive earrings to a neighbor, Shawnna said she liked to do nice things for people and the neighbor had helped her out recently. Shawnna admitted she sometimes would drive around without a specific place to be. Regarding the incident with the funeral procession, Shawnna denied she felt supernaturally drawn to a man in the casket of the funeral procession. Instead, she told a police officer about a car ride in which she had passed a funeral procession and the name of the funeral home stuck in her mind. She said nothing else occurred. Shawnna stated her home was in disarray at the time because of renovations. It was clean and orderly before the renovations and in good condition as of the date of the hearing.

¶ 31        Shawnna stated, on September 21, 2021, her potassium levels were dangerously low, and she received six doses of potassium to attempt to bring the levels back up. She denied taking any medication other than the potassium given by the hospital. She clarified the other

medications were "standing orders, not medications that she had taken." Shawnna testified her primary doctor monitored her potassium levels very carefully after she left the hospital. There was a significant drop in her potassium levels about a week later. Shawnna started taking potassium supplements daily until her appetite started to resume and she started gaining weight again, at which point the potassium levels were consistently stable and the supplements were discontinued.

¶ 32 Shawnna said she previously had a problem with low potassium about eight years ago. She had been very sick, and her potassium levels dropped after the illness. Shawnna's chest got very tight and heavy, and she felt like she was having a heart attack. She went to the emergency room, where she was given potassium supplements and released. She said her potassium levels were even lower on September 21, 2021, and the symptoms manifested differently this time. She knew she did not feel right, but she also did not realize her body was in a medical crisis, or she would have sought treatment.

¶ 33 Shawnna stayed with her mother after her release so she could stay with N.F. until she met with DCFS. Shawnna had a mental-health evaluation in June 2022, and she did not receive any diagnosis of mental illness or recommendations for treatment. The bystander's report indicates the written report of evaluation was not allowed into evidence based on Eric's previous motion *in limine*.

¶ 34 Regarding Brandon, Shawnna testified he was not physically abusive. She suspected Brandon was using steroids, and she previously demanded he open the safe to prove there were no drugs on her property. When steroids were found inside, Shawnna made him leave with the steroids immediately.

¶ 35     When asked about allegations Shawnna had continuously texted Eric demanding to see the girls and went to his house repeatedly, she testified the DCFS caseworker told her it was fine for N.F. to stay with her at home alone and confirmed she was free to resume the court-ordered parenting plan for S.W. and E.W. However, Eric refused and said DCFS told him she could not see them. Shawnna texted the DCFS caseworker to inform him Eric was continuing to withhold visitation, and the DCFS caseworker stated he did not have anything to do with the visitation at that point. A motion by Eric's counsel to strike that statement as nonresponsive was denied.

¶ 36     Shawnna stated she attempted to pick up the girls at Eric's house only on her parenting time, and she always texted him in advance that she would be there to pick them up. Shawnna stated most of the time nobody was there, or nobody would answer the door. Shawnna would ring the doorbell, but she denied screaming for the girls to come with her.

¶ 37     Shawnna testified when visitation occurred at the coffee shop, Eric arrived with a new girlfriend, which she felt was inappropriate. Shawnna said it upset her because S.W. and E.W. "were putting on a big show for the girlfriend" by ignoring her. Shawnna asked the girls to come with her and N.F. outside so they could spend some time together, and they refused. S.W. called Shawnna by her first name and said she and E.W. did not feel safe and they hated her and never wanted to see her again. S.W. said Shawnna was a monster, crazy, a horrible mom, and that she was going to live with Eric. Shawnna testified Eric put his arm around S.W. "very arrogantly" and said, "I understand, I understand." Shawnna was irritated by Eric's actions and asked him, "What is it that he understands? He understands that it is okay for a child to call her mom by her first name and say she hates her and does not love her and act disrespectful, and that

is okay?" Shawnna said Eric did not comment, and E.W. "took off walking away and crying." Shawnna and N.F. then left.

¶ 38      Regarding the current weekly visitation, Shawnna testified she did not recognize the behaviors of her children. Shawnna stated the girls were very hateful towards her and made a lot of comments about Shawnna being in a relationship with Brandon. However, according to Shawnna, Brandon "had been gone" for 10 months at the time of the September 21, 2021, incident, and they had not been together for 1.5 years at the time of the hearing on the order of protection. Shawnna stated she does meet with him in public so he can spend time with N.F. Shawnna testified she attends the girls' extracurricular activities and games and then leaves following, not causing any issues.

¶ 39      On June 27, 2022, the trial court declined to extend the order of protection. The court stated the situation was the result of a medical condition. The court further stated Kadin acted like a fool on September 21, 2021, and scared the girls likely just as much if not more than Shawnna had. The court further commented it was reprehensible for one parent to allow children to show disrespect to the other parent, and it was even more reprehensible that the basis for allowing the disrespect was to take advantage of a medical condition. The court continued the matter for further consideration.

¶ 40      On August 23, 2022, the trial court denied the petition for an order of protection. The court noted the Act provides for the issuance of an order of protection if the court finds abuse, and it defines abuse to mean "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person *in loco parentis*." The court did not find any evidence of physical abuse or acts otherwise meeting the definition of abuse.

¶ 41    The trial court further stated harassment was defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress." The court found Shawnna's conduct was not knowing because it resulted from her medical condition. The court stated the medical condition caused her to act inconsistently with her usual manner of behavior. Further, once the medical problem was addressed, any need for an order of protection was eliminated because Shawnna no longer posed a threat to act in such a manner.

¶ 42    The trial court acknowledged Shawnna's behavior was bizarre and erratic, and it was clearly frightening to the girls. However, the court repeated the behavior flowed from a medical condition, low potassium, over which Shawnna had no control. The judge stated he had a family member who was oxygen-deprived, which caused hallucinations. Upon receiving oxygen, the family member's behavior returned to normal. The bystander's report does not note any objection to that statement. The court further found Kadin, by his own admission, reacted poorly on September 21, 2021, and did as much if not more to inflame the situation and upset the girls than anything Shawnna did on that day. The court denied Eric's motion for leave to amend the petition to allow for modification of child support.

¶ 43    This appeal followed.

¶ 44                    II. ANALYSIS

¶ 45    On appeal, Eric contends the trial court's determination denying a plenary order of protection was against the manifest weight of the evidence. He argues the court erred in determining Shawnna's conduct was not abuse, harassment, or intimidation of a dependent under the Act. He also argues the court erred in considering nonresponsive or hearsay evidence and by relying on irrelevant personal experience.

¶ 46 We note this case has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018). Rule 311 states in relevant part that, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, petitioner's notice of appeal was filed on September 23, 2022. As a result, a disposition would otherwise be required by February 19, 2023. That filing deadline has passed. However, respondent requested, and was granted, separate extensions of time to file a brief. Respondent's brief was filed on December 20, 2022, and his reply brief was not filed until January 17, 2023. Given 'respondent's motions, we conclude good cause exists for issuing this decision after the 150-day deadline.

¶ 47 A. Forfeited Issues of Hearsay and Reliance on Personal Experience

¶ 48 We first note Eric has forfeited his arguments concerning nonresponsive or hearsay evidence and also his argument the trial court erred by relying on personal experience when it denied the petition for an order of protection.

¶ 49 In his brief on appeal, Eric failed to provide any legal argument or citation to authority for his argument concerning hearsay and the trial court's statements about personal experience. Instead, he notes various objections made at trial, includes portions of testimony not objected to, and then simply asserts in one sentence, "the above ruling appear [*sic*] arbitrary, and certainly affected the outcome of the case." "[T]he failure to cite legal authority in the argument section of a party's brief forfeits the issue for review." *In re Marriage of Parr*, 345 Ill. App. 3d 371, 380, 802 N.E.2d 393, 401 (2003). Further, while Eric notes various times hearsay objections were overruled, the bystander's report does not show there were objections to some of the testimony he contends was problematic. In particular, he has not shown an objection to the court's statement based on personal experience. "Where a party fails to make an appropriate

objection in the court below, he or she has failed to preserve the question for review and the issue is [forfeited]." *In re April C.*, 326 Ill. App. 3d 225, 242, 760 N.E. 2d 85, 98 (2001). Accordingly, we find those arguments forfeited.

¶ 50                                              B. Application of the Act.

¶ 51            Eric next contends the trial court's denial of the plenary order of protection was against the manifest weight of the evidence because Shawnna's behavior constituted abuse, harassment, and intimidation of a minor under the Act and, applying the purpose of the Act, a plenary order of protection was necessary to prevent further harm or abuse.

¶ 52            The Act provides for the entry of (1) an emergency order of protection (750 ILCS 60/217 (West 2020)), (2) a 30-day interim order of protection (750 ILCS 60/218 (West 2020)), and (3) a plenary order of protection lasting up to two years (750 ILCS 60/219 (West 2020)). If the trial court finds a petitioner has been abused by a family or household member, an order of protection prohibiting the abuse shall issue. 750 ILCS 60/214(a) (West 2020).

¶ 53            The primary purpose of the Act is to aid victims of domestic violence and to prevent future violence. See *Radke ex rel. Radke v. Radke*, 349 Ill. App. 3d 264, 268, 812 N.E.2d 9, 13 (2004). The "central inquiry" in such a proceeding is "whether the petitioner has been abused," which involves "an issue of fact that must be proven by a preponderance of the evidence." *Best v. Best*, 223 Ill. 2d 342, 348, 860 N.E.2d 240, 244 (2006). "Abuse" is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty[,] or willful deprivation." 750 ILCS 60/103(1) (West 2020). "Harassment," in turn, means "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2020). "Intimidation of a dependent" is

defined as "subjecting a person who is dependent because of age, health or disability to participation in or the witnessing of: physical force against another or physical confinement or restraint of another which constitutes physical abuse *** regardless of whether the abused person is a family or household member." 750 ILCS 60/103(10) (West 2020).

¶ 54 The Act requires a trial court, in determining whether to grant a specific remedy, to consider relevant factors that include, but are not limited to, the nature, frequency, severity, pattern, and consequences of the past abuse, and the likelihood of danger of future abuse, neglect, or exploitation. 750 ILCS 60/214(c)(1)(i) (West 2020).

¶ 55 This court has previously reviewed a trial court's findings concerning an order of protection for an abuse of discretion. *Stapp v. Jansen*, 2013 IL App (4th) 120513, ¶ 16, 988 N.E.2d 234, 237-38 (citing *Lutz v. Lutz*, 313 Ill. App. 3d 286, 289, 728 N.E.2d 1234, 1237 (2000)). However, our supreme court has since clarified such findings should be reviewed under the manifest-weight-of-the-evidence standard of review. See *Best*, 223 Ill. 2d at 349-50. " 'A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or where a decision is unreasonable, arbitrary, and not based on any evidence.' " *Stapp*, 2013 IL App (4th) 120513, ¶ 16 (quoting *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 836, 823 N.E.2d 597, 602 (2005)).

¶ 56 Here, the trial court's determination was not against the manifest weight of the evidence. The court found no abuse occurred. While Shawnna's conduct certainly scared the girls, the court, after hearing the evidence and observing the witnesses, found no physical abuse occurred and declined to find harassment or other forms of abuse because Shawnna's conduct was not knowing. In particular, the court specifically court found Shawnna's behavior was caused by a medical condition, low potassium, which had resolved. Thus, her behavior was not

intentional, knowing, or likely to recur. That finding was supported by the medical reports and Shawnna's testimony. Further the record supports the determination Shawnna's erratic behavior was limited to a narrow time in 2021. Accordingly, even if abuse, harassment, or intimidation of a dependent were found, under the Act, the nature, frequency, severity, and pattern of the behavior was limited, and the likelihood of future abuse was low. Under those circumstances, the court did not err in finding Eric failed to show the necessity of continuing the interim order of protection or entering a plenary order of protection.

¶ 57        Eric takes issue with the trial court's findings, noting Shawnna's irrational behavior on multiple occasions on and before September 21, 2021, that scared the girls. He argues her conduct was reckless and created an immediate risk of physical harm. He also argues Shawnna harassed him and the girls because she "should have known" her conduct would not accomplish a reasonable purpose and would cause a reasonable person emotional distress. However, the Act specifically requires "knowing conduct" to find harassment. 750 ILCS 60/103(7) (West 2020). As noted, the court specifically found Shawnna's behavior was unknowing and unintentional, caused by a temporary medical issue that had since resolved. Any other instances of arguable abuse, such as intimidation of a dependent, were also limited and no longer at issue.

¶ 58        To reverse based on Eric's arguments, we would be required to disregard the evidence supporting the trial court's determination. We will not do so. "We defer to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Stapp*, 2013 IL App (4th) 120513, ¶ 17 (citing *Best*, 223 Ill. 2d at 350). "Where a conflict in the witnesses' testimony exists, a reviewing court will not substitute its judgment for that of the trier of fact, whose function it is to determine the credibility of the

witnesses' testimony and the inferences to be drawn therefrom." *Stapp*, 2013 IL App (4th) 120513, ¶ 17 (citing *Best*, 223 Ill. 2d at 350-51). "A reviewing court should not overturn a trial court's finding of fact merely because it might have reached a different decision." *Stapp*, 2013 IL App (4th) 120513, ¶ 17.

¶ 59        We are not in a position to observe the witnesses and reassess their credibility and, based on the evidence presented in the bystander's report, we find the trial court's ruling was reasonable. We also disagree the cases Eric relies on would require us to find otherwise, as they are distinguishable or inapplicable. See *People v. Holtorf*, 397 Ill. App. 3d 805, 811, 922 N.E.2d 1173, 1178 (2010) (finding knowingly and routinely shoplifting with children or leaving them in a running car while shoplifting constituted abuse); *In re T.H.*, 354 Ill. App. 3d 301, 310 820 N.E.2d 977, 985-96 (2004) (finding multiple instances of abuse when child's mother involved the child in acts of prostitution and had the child beg for money and steal food), overruled on other grounds by *Best*, 223 Ill. 2d at 350; *People v. Reynolds*, 302 Ill. App. 3d 722, 728, 706 N.E.2d 49, 53 (1999) (requiring intentional acts to find harassment occurred). Here, the opposite conclusion of the trial court is not clearly evident, and its decision was not unreasonable, arbitrary, or not based on any evidence. *Stapp*, 2013 IL App (4th) 120513, ¶ 16. Accordingly, it was not against the manifest weight of the evidence.

¶ 60                                 III. CONCLUSION

¶ 61        The trial court's denial of the petition for an order of protection was not against the manifest weight of the evidence. Accordingly, for the reasons stated, we affirm.

¶ 62        Affirmed.